**STEPHANIE F., Appellant and Cross–Appellee,**

v.

**GEORGE C., Appellee and Cross–Appellant.**

**Nos. 14055, S–14035.**

Supreme Court of Alaska.

Jan. 20, 2012.

---

Allen M. Bailey, Anchorage, for Appellant and Cross–Appellee.

Susan Orlansky, Feldman Orlansky & Sanders, and Mary–Ellen Meddleton, Anchorage, for Appellee and Cross–Appellant.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

CHRISTEN, Justice.

## I. INTRODUCTION

Stephanie F. and George C. both sought physical and legal custody of their son and daughter.[1] Following lengthy proceedings, the superior court found that it would be in the children's best interests for custody to be awarded to George. This conclusion was supported in part by findings that the parties' daughter had special needs resulting from a neurological disorder and George was more capable of meeting those needs. But the court also found that George committed two acts of violence against Stephanie in the months leading up to their separation. The acts were described by the court as "situational violence" not reflective of a chronic pattern of coercive abuse, but constituting "a history of domestic violence" under AS 25.24.150(g). As a result, a statutory presumption against awarding custody to George was triggered. The superior court concluded that George did not rebut the presumption because he did not complete a batterers' intervention program. Assuming—without deciding—that the perceived conflict between the statutory presumption and the children's best interests likely violated the children's and George's right to due process, the superior court avoided the presumed constitutional infirmity by articulating an alternate standard for overcoming the statutory presumption. The trial court applied the new standard and awarded sole legal and primary physical custody to George. Stephanie appeals.

Because the completion of a batterers' intervention program is not the only way to rebut the presumption in AS 25.24.150(g), and because AS 25.24.150(g) does not prevent the superior court from conducting a complete best interests analysis, the statute does not raise due process concerns. The superior court did not abuse its discretion or make clearly erroneous findings of fact when it ruled that it was in the children's best interests to be in George's custody, but it did not consider whether the steps George took to address his history of domestic violence re-

1. Pseudonyms have been used to protect the privacy of the parties.

butted the presumption in AS 25.24.150(g). We remand for consideration of this issue.

## II. FACTS AND PROCEEDINGS

### A. Facts

Stephanie F. and George C. married in October 1991 and separated in August 2006. George owns a consulting and engineering firm in Homer. Stephanie has a Ph.D. in psychology and works as an educator at the college level. The parties are the parents of a daughter, Elizabeth, born in September 1999 and a son, Brian, born in September 2002. Elizabeth has a neurological syndrome called Nonverbal Learning Disorder (NLD), which shares some attributes of autism. The parties' son does not have special needs. In December 2004, Stephanie and George learned that Elizabeth, then in kindergarten, had been assaulted by classmates at school on more than one occasion. The trial court found that the strain from this discovery, and its aftermath, led to the deterioration of the parties' marriage.

Stephanie filed a petition for an ex parte domestic violence restraining order against George in August 2006. She alleged that two instances of domestic violence occurred in June of that year. One involved George driving dangerously and yelling with the children in the car. In the other instance, Stephanie alleged that George pinned her down by her wrists, screamed at her, and spit in her face. After Stephanie obtained an ex parte domestic violence protective order, George filed for divorce and sought shared legal and physical custody. In her answer to the complaint, Stephanie sought sole legal and primary physical custody.

#### 1. The hearing on the long-term protective order

In September 2006 the superior court held a hearing on Stephanie's request for a long-term protective order. In addition to the instances alleged in her ex parte petition, Stephanie testified that during a verbal fight in early 2006 she retreated to a bathroom in the parties' home and George punched a hole in the door. The superior court found domestic violence had occurred by a preponderance of the evidence and granted Stephanie a long-term protective order, but its order was less specific about whether a second instance of domestic violence occurred:

> Specifically, [George] has physically assaulted [Stephanie] on the occasion of the [pinning] incident and has, through his conduct, threatened sort of other nonspecific assaults. And to the extent that he has blocked her from departing the household or kept her in a certain part of the household, I don't want to overdramatize this and elevate it to kidnapping, but ... I think that that's a form of essentially attempted assault by placing her in fear that it will escalate if she tries to depart.

The court did not order George to enroll in a rehabilitation program for perpetrators of domestic violence though Stephanie had requested this relief in her petition. The court issued an interim custody order granting Stephanie sole legal and primary physical custody and granting George six hours of unsupervised visitation per week.

#### 2. The July 2007 custody investigation report

The superior court scheduled trial for August 2007 and appointed Pamela Montgomery to conduct a custody investigation and make a custody recommendation.[2] Montgomery's first report was issued in July 2007. It incorporated a psychological evaluation of both parties by Dr. Melinda Glass and a psychological evaluation of Elizabeth by Dr. Cathleen von Hippel. At the time Montgomery issued her report, the children were ages seven and four.

Dr. Glass opined that both parents had "challenges accurately assessing their children's needs" and getting along with others, but neither had a diagnosable personality disorder. Her report also stated that both parents were capable of meeting the children's needs, but it was not clear if they would "stop pointing fingers at each other

---

**2.** The trial date was later changed to September 2007 when Stephanie's motion for a continuance

was granted.

long enough" to do so. Custody investigator Montgomery reported that the parties were "generally competent, intelligent adults who dearly love their children" and that their marriage fell apart after Elizabeth was assaulted.

Custody investigator Montgomery was aware of the superior court's 2006 domestic violence finding, but she observed that there had been no additional allegations of domestic violence and "no hint of any kind of violence" since that time, and that the superior court had not ordered George's visitation to be supervised. Montgomery opined that the children would not be endangered by contact with either parent, observing that Stephanie asserted herself when she felt wronged and that the parties had done well negotiating schedule modifications in the period between September 2006 and July 2007.

Dr. von Hippel's comprehensive evaluation of Elizabeth was also incorporated into Montgomery's report. It reflected Elizabeth's diagnosis of NLD and explained that Elizabeth required special attention and services such as an Individualized Education Plan (IEP) at school. Montgomery reported that the parties' son, Brian, did not have special needs.

Montgomery did not make a final custody recommendation in her July 2007 report. Because of her concern that both parties had psychological issues that could prevent them from fully meeting Elizabeth's needs, she recommended an additional observation period and an updated report after George and Stephanie had the opportunity to participate in counseling. Montgomery recommended shared physical custody on a three-days-per-week/four-days-per-week schedule in the interim. Because Stephanie was more involved in the children's day-to-day caretaking at that point, the report suggested Stephanie receive interim legal custody.

After receiving the custody investigator's report, Stephanie and George stipulated to George having unsupervised visitation every other weekend and after school on Tuesday and Thursday. The children otherwise resided with Stephanie.

### 3. The proceedings between September 2007 and April 2008

The custody trial began in September 2007 but it was continued to January and February 2008. Both parties offered extensive testimony from several fact and expert witnesses.

Stephanie's case relied heavily on the expert testimony of Dr. Noël Busch, who the court deemed qualified as an expert on domestic violence. Dr. Busch did not evaluate the parties; she testified about the dynamics of domestic violence generally. Dr. Busch claimed the "negative consequences" of a child's continued post-divorce contact with an abusive parent are greater than the consequences of having no contact with that parent at all.[3]

In response to questions posed by Stephanie's counsel about an exhibit describing a series of events in a hypothetical marriage, Dr. Busch testified that the series of scenarios represented a dynamic of coercive control and abuse. When Stephanie testified, she stated that the hypotheticals accurately reflected scenarios that occurred during the parties' marriage. But she also conceded in her closing argument that the risk of George posing a threat of mental or physical harm was outweighed by the children's need to have contact with George.

The superior court also heard testimony from Dr. Glass, the psychologist who evaluated the parties in March, April, and May of 2007. Dr. Glass opined that there was a breakdown in the marriage after Elizabeth was assaulted, the parties disagreed about how to help her in the aftermath, and "problems between [Stephanie and George] escalated and became quite traumatic." For George, it resulted in what Dr. Glass called "situational violence as the result of a high conflict." Dr. Glass testified that George's behavior did not amount to "a pattern of intimate partner violence."

**3.** At the court's request, Stephanie submitted two chapters of a book that Dr. Busch referred to in her testimony and several journal articles that Dr. Busch provided. The literature discussed the relationship between the well-being of children and contact with a nonresident father, and the harmful effects on children of exposure to domestic violence.

Custody investigator Montgomery testified that Elizabeth's challenges with NLD made school and interacting with other children particularly difficult. Stephanie also testified about NLD. In her testimony, Stephanie referred to a book on NLD that described children with this diagnosis as lacking the "filtering mechanism to block out extraneous stimuli."[4] According to the book Stephanie referred to, children with NLD are often "unable to anticipate what will happen next,"[5] "thrive on routine ... [and] need[ ] as much predictability as possible in order to get through the day without becoming totally overwhelmed."[6]

It was uncontested that NLD impacts Elizabeth's ability to function and learn. Dr. von Hippel's evaluation explained:

> [Elizabeth's] weakness in the speed of processing routine information may make the task of comprehending novel information more time-consuming and difficult for [her]. Thus, this weakness in simple visual scanning and tracking may leave her less time and mental energy for the complex task of understanding new material.

Dr. von Hippel observed that Elizabeth exhibited: (1) a lack of coordination, balance and fine motor skills; (2) difficulty with spatial relations; and (3) "misinterpretation of body language or tone of voice, deficits in social judgment and interactions, [and] difficulty with personal space."

In January 2008 the custody investigator testified that for children with difficulties like Elizabeth, among other strategies, "the rec-

ommendation is to ... get them [to school] early, so they have a longer period of time to settle in, [and] be ready to roll at the beginning of the school day...." But in the fall 2007 semester, Elizabeth was tardy 37 days and absent seven days out of a total of 85 school days while in Stephanie's custody. When asked to explain the tardies and absences, Stephanie testified that Elizabeth was late to school because Elizabeth was "very resistant and noncompliant" in the mornings making it hard for Stephanie to get her up, dressed, and out the door. Stephanie testified that she also had difficulty getting Brian to preschool; she explained he did not like school on the days George was going to be picking him up and that Brian told her he did not like his dad. George presented conflicting testimony on this point.

In January 2008 the superior court expressed to the parties that the presumption in AS 25.24.150(g) against awarding custody to a parent with a history of perpetrating domestic violence might prevent the court from awarding George joint physical custody.[7] George's counsel expressed surprise that the presumption might apply, and asked that the evidence be reopened to permit the presentation of testimony from George's private therapist, Lisa Turner.[8] George's argument was that private counseling Turner provided after Elizabeth was assaulted and after the parties separated amounted to the "same thing" as the "intervention program for batterers" identified in AS 25.24.150(h) as a way of rebutting the presumption against awarding George custody.[9] The superior court

---

4. PAMELA B. TANGUAY, NONVERBAL LEARNING DISABILITIES AT HOME: A PARENT'S GUIDE (2001). Rather than allowing Stephanie to read from this book, the court allowed Stephanie to provide a copy of it to the court. The final set of findings of fact and conclusions of law cited several passages from this book, including pages 89–90.

5. *Id.* at 91–92.

6. *Id.* at 89–90.

7. AS 25.24.150(g) states:

 There is a rebuttable presumption that a parent who has a history of perpetrating domestic violence against the other parent, a child, or a domestic living partner may not be awarded sole legal custody, sole physical custody, joint

legal custody, or joint physical custody of a child.

8. The long-term domestic violence protective order issued by the superior court found that George committed a crime involving domestic violence by a preponderance of the evidence, but it did not indicate how many acts occurred, it did not order George to complete a batterers' intervention program, and it did not require George's visitation to be supervised. These provisions of the order were inconsistent with the relief Stephanie sought in her petition for a protective order, but Stephanie did not object to the terms of the visitation or seek reconsideration of the order.

9. AS 25.24.150(h) states:
 A parent has a history of perpetrating domestic violence under (g) ... if the court finds

granted George's motion. An evidentiary hearing was held in April 2008 where both parties were allowed to present evidence and argument on whether George rebutted the presumption in .150(g).

Turner testified that George began therapy in May 2006 when he sought help coping with the discovery of the assaults on Elizabeth. She testified that George completed twelve sessions, and that he did not exhibit characteristics consistent with a "pattern of behavior to gain and maintain control and power over another person in the context of an intimate relationship." Turner also testified that it was not appropriate to refer George to a batterers' intervention program; in fact, she testified that traditional batterers' intervention group sessions would be "contraindicated" in George's case and "could be more detrimental than productive." Turner testified to the "significant progress" George made in improving his empathy skills through the course of his therapy.[10] At the conclusion of the hearing, the court took the custody decision under advisement.

### 4. Stephanie's relocation to Anchorage

In July 2008, before a final custody order was issued, Stephanie informed the court that she had accepted a job in Anchorage and would be relocating from Homer with the children. She explained that the position in Anchorage would provide her with a significant pay increase and better working conditions, and that Elizabeth would no longer need to travel to Anchorage for therapy. George objected to the children moving to Anchorage and filed a motion to again reopen the evidence. The superior court allowed the children to move to Anchorage with Stephanie beginning in the fall of 2008 and ordered an updated custody investigation report. Unbeknownst to the court, the parties agreed to share custody on a three-day/four-day schedule during the fall semester of the

2008–2009 school year. George drove to Anchorage each week and spent Thursday evening with Elizabeth and Brian. He took the children to school on Friday morning, and they stayed in his custody until Sunday evening. Elizabeth and Brian were in Stephanie's custody from Sunday evening until Thursday of each week.

### 5. The December 2008 hearings and the second custody investigator's report

Custody investigator Montgomery issued a second report after the children had completed a semester of school in Anchorage. And in December 2008, the superior court heard two days of additional testimony about the children's experiences in Anchorage relative to Homer, focusing largely on the events and observations described in the updated custody investigation report.

The evidence showed that Stephanie enrolled the children in a German immersion charter school in Anchorage despite the principal's warning that the school had "minimal special education services" and could not admit Elizabeth until they had seen her IEP. The court also heard that, after receiving this warning, Stephanie took the children to the charter school on the first day of class without providing Elizabeth's IEP. Montgomery opined that Stephanie's decision to take Elizabeth to the charter school without her IEP "set this child up for a painful school failure," that Elizabeth's special needs were beyond the school's capacity, and "socially [she] did not fit in at all." Brian struggled at the German immersion school as well. His teacher reported that Brian "often was the only one not participating in an activity. . . . He excluded himself from group activities on a daily basis to an extreme—like sitting alone at a table." The evidence showed that on most days the children arrived at school late. After one month, the school informed

---

that, during one incident of domestic violence, the parent caused serious physical injury or the court finds that the parent has engaged in more than one incident of domestic violence. The presumption may be overcome by a preponderance of the evidence that the perpetrating parent has successfully completed an intervention program for batterers, where reasonably available. . . .

**10.** Turner testified that George had "Asperger-type traits" but that he did not meet the diagnostic criteria for Asperger's syndrome. Turner testified that his Asperger-like traits "could compromise [his] sense of empathy." The superior court found that George had "difficulty reading some social cues."

Stephanie that she would need to remove the children from the school. Unlike the school in Homer, the neighborhood school in Anchorage did not provide Elizabeth with a designated aide, occupational therapy, or socialization training.

Montgomery's updated custody investigation report observed that Stephanie was unwilling or unable to "accept responsibility for the children's behavior while in her care," instead attributing any problems to George. As examples, Montgomery explained that Stephanie faulted George for her inability to get Elizabeth to school on time and claimed that the children were acting out with her because she was the "safer parent."

Montgomery recommended that it was in the children's best interest to return to school in Homer under George's primary physical custody. She recommended either joint legal custody or that George should have sole legal custody. On December 31, 2008, the court issued a brief final custody order granting George primary physical custody effective January 2009.[11] The order was issued in time to allow the children to be transferred back to school in Homer prior to the start of the second semester.

### 6. The December 2009 proceedings

In January 2009, Stephanie filed a motion to supplement the factual record or for a new trial. The court denied this motion, but Stephanie filed a second motion to supplement the record or for a new trial in August 2009 due to changed "educational circumstances" and "emotional conditions" of the children. The court scheduled a two-day evidentiary hearing in December 2009. By the time of the December hearing, the children had been back in Homer for approximately one year.

Elizabeth's teachers and former principal from Homer, her psychologists, and the custody investigator all testified that Elizabeth was thriving in Homer in George's custody. Community members testified that Brian also appeared happy and comfortable with his father.

### 7. The superior court's final custody order

In June 2010, the superior court issued findings of fact, conclusions of law, and a final custody order granting sole legal and physical custody of both children to George.

The superior court's written findings of fact reflect its analysis of the statutory "best interest" factors under AS 25.24.150(c) for both children, including consideration of Elizabeth's special needs. In particular, the court found that arriving late to school was "very disruptive" for Elizabeth, and that Stephanie failed to meet Elizabeth's basic and critical need to arrive at school on time, "depriv[ing Elizabeth] of academic and social opportunities."

In contrast, the court found George was able to get Elizabeth to school on time, and that the school in Homer provided Elizabeth with a regular routine, special attention, and services. As a result, the court found Elizabeth was better adjusted and happier in Homer and that her emotional state and behavior had improved under George's care. The court concluded that "[t]o move [Elizabeth] to Anchorage for the sixth grade would be disastrous for her."

The superior court found that Stephanie's characterization of the marriage as "marked by domestic violence" was not credible. The superior court was persuaded that the domestic violence that occurred was "situational violence" and not a "tool[ ] used to effectuate ... control." The court also found that George had regularly seen a therapist to help him "understand and change his behavior," and that treatment helped George significantly improve his empathy skills. The court agreed with Dr. Glass that Stephanie's "world view and her interpretation of [George's] responsibility" negatively impacted her ability to meet the needs of the children and allow them to have a relationship with their father. The order concluded that it was in the children's best interest to be in

11. The court stated that it was announcing its basic decision and would follow with a more complete opinion.

George's physical custody.[12]

The court recognized that George's two acts of domestic violence amounted to a "history of perpetrating domestic violence" under AS 25.24.150(g), and it articulated its understanding that AS 25.24.150(h) allows for *only one* way for the presumption concerning custody to be overcome—the perpetrator must complete an intervention program for batterers." [13] It was undisputed that George had not completed an intervention program for batterers and the court ruled that the twelve counseling sessions George had completed with Turner had not been a "substitute in nature or duration for an intervention program for batterers" as described in AS 25.24.150(h). The court concluded that application of the presumption in .150(g) would leave the court with "no option" but to grant Stephanie physical and legal custody, contrary to the children's best interests.

The court interpreted AS 25.24.150(g)-(h) as preventing it from considering any of the best interests factors in AS 25.24.150 *other than* George's history of domestic violence. The court assumed, without deciding, that if the statutory presumption prevented it from considering evidence other than the history of domestic violence, it could not provide a meaningful hearing, and that George and the children would be denied their right to due process. Rather than find AS 25.24.150(g) and (h) unconstitutional as applied, the superior court construed the statute to permit the rebuttable presumption against custody to be overcome if "[t]he trial court ... finds by clear and convincing evidence that to follow the presumption and award legal and/or physical custody to the victim of domestic violence would clearly be detrimental to the child." Applying this standard, the superior court decided that awarding custody to Stephanie would be detrimental to the children and it awarded George sole legal and physical custody. Stephanie appeals.[14]

## III. STANDARD OF REVIEW

 The superior court has broad discretion in determining custody awards "so long as the determination is in the child's best interests." [15] We "will not reverse a superior court's custody determination unless it abused its discretion or its controlling factual findings are clearly erroneous." [16]

 We will find an abuse of discretion when the superior court "considers improper factors in making its custody determination, fails to consider statutorily mandated factors, or assigns disproportionate weight to particular factors while ignoring others." [17] However, we grant "particular deference to the trial court's factual findings when they are based primarily on oral testimony, because the trial court, not this court, performs the function of judging the credibility of witnesses and weighing conflicting evidence." [18] We find "clear error when, after review of the entire record, 'we are left with a definite and firm conviction' a mistake occurred." [19]

 "The interpretation of a statute is a question of law to which we apply our inde-

---

**12.** The superior court stated:

> The Court has no doubt that [the children] must be in the primary physical custody of [George]. He, and not [Stephanie], can navigate the difficulties of [Elizabeth's] emotional life so that she has academic and social opportunities during the school year.... The fact that [George] assaulted [Stephanie], after the parties' marriage deteriorated in reaction to the trauma the family experienced after [Elizabeth] was assaulted, is tragic.... But the Court has no doubt that those acts of domestic violence were isolated events and will not be repeated. The children are not at risk that [George] will engage in acts of violence directed at them or at others in their presence.

**13.** Emphasis added.

**14.** George filed a Notice of Cross–Appeal, but ultimately did not pursue one.

**15.** *Misyura v. Misyura*, 242 P.3d 1037, 1039 (Alaska 2010) (quoting *Thomas v. Thomas*, 171 P.3d 98, 102 (Alaska 2007)).

**16.** *Id.* (quoting *Thomas*, 171 P.3d at 102).

**17.** *Id.* (quoting *Jenkins v. Handel*, 10 P.3d 586, 589 (Alaska 2000)).

**18.** *Millette v. Millette*, 177 P.3d 258, 261 (Alaska 2008) (quoting *Ebertz v. Ebertz*, 113 P.3d 643, 646 (Alaska 2005)).

**19.** *Wee v. Eggener*, 225 P.3d 1120, 1124 (Alaska 2010) (quoting *Dingeman v. Dingeman*, 865 P.2d 94, 96 (Alaska 1993)).

pendent judgment, interpreting the statute according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose."[20] "Issues of constitutional interpretation are questions of law which we review de novo."[21] "The constitutionality of a statute and matters of constitutional or statutory interpretation are questions of law to which we apply our independent judgment, adopting the rule of law that is most persuasive in light of precedent, reason, and policy."[22]

## IV. DISCUSSION

### A. The Superior Court Did Not Clearly Err By Finding That It Was In The Children's Best Interests To Be In George's Custody.

■ Stephanie argues that the superior court's best interest analysis was erroneous because it overemphasized her failure to get Elizabeth to school on time and undervalued the harm of granting custody to a parent with a history of perpetrating domestic violence. She also argues that the court mischaracterized George's abuse as "situational violence" rather than "a strategy of control, overbearing power, or manipulation," and that the superior court "ignored the history of intimidation, isolation, control and physical abuse" Stephanie described in her testimony. George counters that the superior court's determination that he only committed isolated acts of domestic violence is supported by the expert testimony of Dr. Glass, custody investigator Montgomery, and therapist Lisa Turner. He also argues that Stephanie's expert, Dr. Busch, did not evaluate the parties and was unable to apply her general knowledge and theories regarding domestic violence to the parties' actual marriage.

George also calls our attention to Dr. Glass's description of Stephanie's "tendency to reinterpret past events."

Having reviewed the record, including the superior court's findings of domestic violence and its analysis of the best interest factors in AS 25.24.150(c), we conclude that the superior court's determination that it was in the children's best interests to be placed in George's custody is supported by the record.

### 1. The court did not give undue weight to Elizabeth's need to get to school on time.

■ "The paramount consideration in the determination of child custody is the best interests of the child."[23] Alaska Statute 25.24.150(c) provides a list of factors the trial courts must consider in determining a child's best interests. "The superior court need not discuss each of the factors; it must only address those that are 'actually relevant in light of the evidence presented.'"[24] We review "the adequacy of findings for 'whether they give a clear indication of the factors considered important by the trial court or allow us to determine from the record what considerations were involved.'"[25] In this case, the superior court found the most salient factors to be the needs of the children, the ability of the parents to meet those needs, and the nature of the parties' domestic violence.

The superior court found that Elizabeth had "a complex and profound neurological syndrome called Nonverbal Learning Disorder" that shares some attributes of autism. Relying on a text provided by Stephanie and testimony offered at trial, the court found that children with NLD lack the "filtering mechanism to block out extraneous stimuli

**20.** *Parson v. State, Dep't of Revenue, Alaska Hous. Fin. Corp.*, 189 P.3d 1032, 1036 (Alaska 2008) (citing *Parker v. Tomera*, 89 P.3d 761, 765 (Alaska 2004)).

**21.** *State v. Alaska Civil Liberties Union*, 978 P.2d 597, 603 (Alaska 1999) (citing *Revelle v. Marston*, 898 P.2d 917, 925 n. 13 (Alaska 1995)).

**22.** *Premera Blue Cross v. State, Dept. of Commerce, Cmty. & Econ. Dev., Div. of Ins.*, 171 P.3d 1110, 1115 (Alaska 2007) (quoting *State Commer-*

*cial Fisheries Entry Comm'n v. Carlson*, 65 P.3d 851, 858 (Alaska 2003)).

**23.** *Starkweather v. Curritt*, 636 P.2d 1181, 1182 (Alaska 1981).

**24.** *Thomas v. Thomas*, 171 P.3d 98, 102–03 (Alaska 2007) (quoting *Virgin v. Virgin*, 990 P.2d 1040, 1045 (Alaska 1999)).

**25.** *Id.* (quoting *Borchgrevink v. Borchgrevink*, 941 P.2d 132, 137 (Alaska 1997)).

.... [e]verything comes at them with equal force—noise, lights, images, people—and they are virtually bombarded with information that they are unable to sort." As such, children with NLD "thrive on routine ... [and] need[ ] as much predictability as possible in order to get through the day without becoming totally overwhelmed." The court called arriving at school on time a "basic need" for Elizabeth.

The superior court was troubled that Elizabeth was late getting to school frequently while in Stephanie's custody. She was late getting to school 37 times in the fall 2007 semester, and 33 times during the spring semester. When George had custody, Elizabeth arrived at school on time if not early. The court found unconvincing Stephanie's explanation that NLD was the cause of Stephanie's inability to get Elizabeth to school on time, noting that George was able to do so.

The court's findings that Elizabeth's semester in Anchorage "was detrimental to Elizabeth," and that Stephanie "again proved to be incapable of providing the stability in their daily lives that both children needed ... [Elizabeth] desperately so" are supported by the record. Stephanie clearly understood that Elizabeth's special needs caused her to experience the world as bombarding her with light, sound, and sensory overload, but Stephanie placed her in a German immersion school. She took this step without providing Elizabeth's IEP or making prior arrangements, despite the principal's warning that the school had "minimal special education services" and that they would need to see Elizabeth's IEP before admitting her. Custody investigator Montgomery stated that this lack of coordinated planning had been a setup for failure. After hearing considerable testimony and receiving documentary evidence pertaining to the month the children were enrolled at the German immersion school, the superior court described the experience as a "debacle."

Elizabeth's therapist reported that Elizabeth continued to experience academic difficulties after she and Brian were transferred to an Anchorage neighborhood school, and they continued to arrive late.[26] Custody investigator Montgomery reported that the Anchorage school did not provide Elizabeth with a designated aide, occupational therapy, or socialization training.

The record supports the superior court's findings that Elizabeth's experience in George's custody was far more successful. Elizabeth's special services teacher and case manager testified that since transferring back to Homer, Elizabeth arrived at school early to participate in extracurricular activities and made a "tremendous amount of progress."

We agree with Stephanie that the superior court placed considerable weight on the parties' respective abilities to get the children to school on time, but we cannot say that this factor was inappropriately weighed under the circumstances of this case. The evidence was uncontroverted that Elizabeth had a greater need for structure and routine than most children. Her struggles with NLD made it essential that she arrive at school on time and she was clearly more successful at school after she was returned to George's custody. School personnel and custody investigator Montgomery specifically cited prompt arrival in the classroom as particularly important to Elizabeth's success. The superior court did not inappropriately weigh the respective abilities of the parties to get the children to school on time.

### 2. The superior court considered the other best interests factors in AS 25.24.150(c).

The findings show that the superior court considered a broad spectrum of factors concerning the children's best interests, including their emotional needs. A community member who had long known the children agreed that they were happier and better

---

**26.** Custody investigator Montgomery observed Elizabeth at the Anchorage neighborhood school on a day when Stephanie had custody. Elizabeth was the only child to arrive late on that day, and the other students were already engaged in their first assignment. Montgomery reported that Elizabeth came in frowning, her hair was disheveled, she had dried food on her face, and she did not interact with the other children.

behaved after George received primary custody, and the superior court agreed with the parties that the children's interests would best be served by remaining together. The evidence showed that Elizabeth was accepted by her peers in Homer and she voluntarily participated in class activities. Elizabeth's teacher testified that George came to the classroom almost daily to check in on Elizabeth's progress, guest-taught science lessons on several occasions, took the students on field trips, was very supportive of Elizabeth, and helped her overcome feelings of anxiety. The court heard testimony from the Homer school psychologist and teachers that Elizabeth was receiving services in Homer to meet her special needs, arriving to school on time, and that she was happier, more confident, and doing well academically and socially. Elizabeth's therapist in Anchorage recommended that she remain in Homer through sixth grade because she was doing better there. The court found that the Homer school was comfortable for Elizabeth and that transferring to school in Anchorage would be difficult.

The court also considered the parties' respective abilities to meet the children's needs. Both parents were initially found to have psychological issues that impacted their parenting ability, but the superior court received evidence showing that George made progress through therapy. The record does not include evidence that Stephanie made similar progress. Citing Dr. Glass's 2007 evaluation, the superior court found "[Stephanie] does appear to feel victimized by others, in particular her husband, and blames him for the failure of the marriage and most of the problems with the children." The court agreed with Dr. Glass that Stephanie had "difficulty allowing her children to express themselves emotionally" and that she may have problems "allow[ing] her children to have a relationship with their father."

### 3. The court considered the domestic violence that occurred during the parties' marriage.

Stephanie argues that the court did not properly consider the evidence concerning domestic violence. She cites *Borchgrevink v. Borchgrevink,*[27] and argues that our court has recognized the "deleterious impact on children of witnessing domestic violence." She also cites a series of academic articles discussing the negative effect exposure to domestic violence has on children, and *Farrell v. Farrell,*[28] for the proposition that joint legal custody is inappropriate where domestic violence has occurred between parents.

But the superior court was very aware that George committed at least two acts of domestic violence during the parties' marriage, and that this triggered the statutory presumption in AS 25.24.150(g). The court found Stephanie's testimony describing the June 2006 incident to be credible, as it did her description of a March 2006 incident when George punched a hole in a door of their house. The court did not find credible Stephanie's overall characterization of the marriage as being marked by domestic violence. The superior court found that Stephanie "re-evaluated her relation[ship] with [George] through the distorting lens of a particular, simplistic theory of domestic violence" after the 2006 incident when George pinned her down by her wrists.

The court's finding that the "children are not at risk that [George] will engage in acts of violence directed at them or at others in their presence" is supported not only by the testimony of experts who evaluated the parties, but also by Stephanie's concession that the danger of mental or physical harm to the children was outweighed by their need to have contact with George and her position that his visitation did not need to be supervised. The superior court's findings concerning domestic violence relied in part on its evaluation of the extensive expert testimony offered by Dr. Glass, Dr. Busch, custody investigator Montgomery, and George's therapist, Lisa Turner. Dr. Glass evaluated both parents as part of the initial custody investigation. She did not find a history of abuse in the marriage prior to Elizabeth being assaulted and she concluded that the stress of the assault ultimately led to the breakdown of the parties' marriage. She also testified

**27.** 941 P.2d 132.

**28.** 819 P.2d 896 (Alaska 1991).

that Stephanie's perceptions of past events in the marriage were based on her interpretation of what happened, not necessarily what actually happened. Dr. Glass explained:

> [A]ny time a marriage starts to fall apart and a person looks back towards what's happened previously in their marriage, there's a tendency to see things with a different eye.... [T]hings that you deal with with your spouse can look very different[ ] when you're angry at them and you're finished with a relationship than they do when you're moving forward in the relationship.[29]

Dr. Glass did not excuse George's acts of domestic violence, but she testified that in her opinion it was "situational violence as [a] result of a high conflict," not "a pattern of intimate partner violence" which Dr. Glass defined as a "pattern of control, [or] intimidation, often solidified through some type of violence by one partner over the other." Turner agreed with this assessment. Stephanie's expert, Dr. Busch, testified about domestic violence generally and responded to a series of hypothetical scenarios offered by Stephanie's counsel. Though Stephanie later testified that the hypotheticals accurately described events that occurred during the marriage,[30] the court found the hypotheticals distorting because they "cherry pick[ed]" events from over the course of 15 years of marriage and failed to evaluate the incidents in the context of "the devastation wrought by [Elizabeth's] victimization and the parties' response to it and her learning difficulties."[31] The court found Dr. Glass's testimony to be more credible and persuasive in its evaluation of the nature of the parties' domestic violence. It found Dr. Busch's testimony lacked context and was unconvincing.

Stephanie essentially argues that the superior court should have given greater weight to her testimony and that of her expert. But the trial court was in a better position to assess the credibility of the witnesses, the overall persuasive force of the evidence, and the persuasiveness of the expert testimony.[32] The court's characterization of the type of violence involved—situational—was made in the context of the court determining whether George overcame the statutory presumption and gauging the risk of future violence. This difficult and important assessment is one best made by the trial court. Before making this assessment, the superior court considered the testimony of several lay witnesses and experts. We see no error in its finding that Dr. Busch's testimony was less persuasive; Dr. Busch did not evaluate the parties. She answered a series of hypothetical questions, and the parties disagreed about whether the hypotheticals depicted actual events from their marriage. The court's factual findings were not based exclusively on its credibility findings regarding the parties' testimony; the court also heard testimony from experts who evaluated Stephanie and George, and the court concluded that the "lens" through which Stephanie viewed the marriage resulted in a somewhat distorted history. The trial court is entitled to considerable deference when it makes findings of fact. On this record, we cannot say that it erred when it found that the children's best interests would be served by remaining in George's custody.[33]

---

**29.** Dr. Glass noted that another psychological evaluation of Elizabeth was completed in January 2005 by a Dr. Burgess. Dr. Burgess's report apparently memorialized Stephanie's statement that the parties' marriage was "quite stable, as is their employment and there are no salient stressors in the family that might otherwise explain the evolution of [Elizabeth's] symptoms." But Stephanie reported to Dr. Glass that she later remembered being abused early on in her marriage. And Dr. Glass's report noted that at the intake interview for Elizabeth's evaluation, Stephanie stated that Dr. Burgess lied to the principal of her daughter's school "by telling [the principal] that they were having family issues."

**30.** George denied that those events occurred during the parties' marriage.

**31.** Stephanie argues that the superior court clearly erred by finding that she failed to connect her testimony to that of her expert witness. But the superior court determined that "even assuming that all [the hypothetical events] were true" they were not persuasive because they failed to "fully describe the context in which they arose."

**32.** *Millette v. Millette*, 177 P.3d 258, 261 (Alaska 2008).

**33.** Stephanie also argues that the court improperly relied on the recommendation of custody investigator Montgomery, claiming she "did not perform in a competent manner" by failing to discuss George's domestic violence. George argues the report met the requirements for custody

### B. The Completion Of A Batterers' Intervention Program Is Not The Only Way To Rebut The Statutory Presumption.

Despite its finding that the children's best interests would be served by awarding custody to George, the superior court recognized that the presumption in AS 25.24.150(g) had been triggered by George's acts of domestic violence. The superior court interpreted AS 25.24.150(h) as allowing "only one way" to overcome the rebuttable presumption—completion of an intervention program for batterers. Because George never completed a batterers' intervention program, the superior court concluded that George failed to rebut the presumption. The court reasoned that if it applied the presumption to deny George custody, its ruling would not be in the children's best interests and the statute would therefore likely violate George's and the children's right to due process. To avoid what it perceived to be a constitutional infirmity in the statute, the superior court construed the statutory scheme to allow the presumption in .150(g) to be overcome by clear and convincing evidence that awarding legal and/or physical custody to the victim of domestic violence would be clearly detrimental to the child. Applying this new standard, the court found that awarding custody to Stephanie would be detrimental to Elizabeth and Brian, and it awarded custody to George.

Stephanie argues on appeal that the "statutory mandate" in .150(g) required the superior court to award custody to her. She relies on *Wee v. Eggener*,[34] characterizing it as an instance where this court "summarily reversed a joint custody order in violation of the statute." She also argues the superior court erred by assuming the statutory presumption in AS 25.24.150(g) is unconstitutional.

### 1. The superior court correctly ruled that the presumption against awarding custody to George was triggered by George's acts of domestic violence.

George argues that the superior court erred by ruling that the presumption in .150(g) was triggered by his acts of domestic violence. He concedes that the incident when he grabbed Stephanie's wrists and pinned her down qualifies as "domestic violence" but he argues that punching a door does not amount to "domestic violence" because it is not "criminal mischief to damage one's own property." Stephanie counters that because she was a co-owner of the home, the door George punched was the "property of another" and therefore intentionally damaging it was "domestic violence" under the statute. We find no merit to George's argument that his conduct did not constitute criminal mischief and therefore did not trigger the statutory presumption against awarding custody to him.[35]

Under AS 25.90.010, "domestic violence" has the meaning given in AS 18.66.990. Under AS 18.66.990(3)(E) "domestic violence" includes acts of criminal mischief. A person commits criminal mischief by intentionally damaging the "property of another."[36] "Property of another" is defined in AS 11.46.990(13) as "property in which [another] person has an interest which the defendant is

---

investigations under Alaska R. Civ. P. 90.6(e) and that Montgomery did address domestic violence when she referred the parties to Dr. Glass for an evaluation. Rule 90.6(e) requires investigators to interview the child and parents, observe the child's interaction with parents, review records provided by the parties and relevant to the child, and interview others with information as needed. Montgomery's extensive evaluation included interviews with the parties, psychologists, and teachers; referral to Dr. Glass to evaluate the risk of physical harm posed by each parent; and referral to Dr. von Hippel to evaluate Elizabeth. This constituted a proper custody investigation under Rule 90.6(e). The superior court did not err in considering Montgomery's recommendations.

**34.** 225 P.3d 1120, 1126 (Alaska 2010).

**35.** At the outset, we reject the suggestion that ownership of a door determines whether punching a hole in it during an argument, in the presence of one's spouse, can constitute domestic violence. Placing another person in fear of imminent physical injury "by words or other conduct" is assault. AS 11.41.230. Assault is within the definition of "domestic violence." *See* AS 25.90.010; AS 18.66.990(3)(A).

**36.** AS 11.46.486(a)(2); AS 11.46.484(a)(1).

not privileged to infringe, whether or not the defendant also has an interest in the property." In *Hughes v. State*, a spouse argued that he could not be convicted of criminal mischief because he and his wife were co-owners of the property he damaged and therefore it was not "property of another."[37] The court of appeals rejected this argument. Citing the definition of "property of another" in AS 11.46.990(13), the court of appeals held that it is "legally possible for a spouse to be convicted of criminal mischief for vandalizing marital property."[38] We agree.

Here, Stephanie alleged that George punched a hole in a door of the parties' family home during the course of an argument. Stephanie had an "interest in the property" because she was a co-owner.[39] As in *Hughes v. State*, George damaged "property in which [another] person has an interest"[40] amounting to criminal mischief and an act of "domestic violence."[41] It was not error for the superior court to find George's behavior amounted to an act of "domestic violence" for purposes of AS 25.24.150(g). Because the incident in which George pinned Stephanie by the wrists also qualifies as "domestic violence," the superior court correctly ruled that George perpetrated two acts of domestic violence, triggering the presumption in AS 25.24.150(g) against awarding custody to him.

**2. The superior court erred by interpreting AS 25.24.150(h) as providing only one way to rebut the presumption in .150(g).**

▮▮ The superior court was well aware that the paramount consideration in child custody proceedings is the best interests of the children.[42] The legislature underscored

the important priority of protecting children from domestic violence when it adopted AS 25.24.150(g)-(h). We have articulated this point repeatedly in our case law.[43] In *Williams v. Barbee*, we recognized that the bill enacting AS 25.24.150(g) "sought to decrease the likelihood that children would be placed in the custodial household where domestic violence exists by ensuring that domestic violence was adequately and specifically included when courts analyzed a child's best interests."[44]

The superior court's order reflects its understanding that "AS 25.24.150(h) allows *only one* way for the presumption concerning custody to be overcome—the perpetrator [of domestic violence] must complete an intervention program for batterers."[45] The court's custody order cited *Wee v. Eggener*[46] as authority for this interpretation of the statute. We interpret the statute differently.

"The interpretation of a statute is a question of law to which we apply our independent judgment, interpreting the statute according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose."[47]

**a. The plain language of the statute**

The pertinent portion of AS 25.24.150(h) states:

> The presumption [against awarding custody to a parent with a history of perpetrating domestic violence] *may* be overcome by a preponderance of the evidence that the perpetrating parent has successfully completed an intervention program for

37. 56 P.3d 1088, 1094 (Alaska App.2002).

38. *Id.*

39. AS 11.46.990(13).

40. AS 11.46.990(13).

41. AS 18.66.990; AS 25.90.010.

42. *R.I. v. C.C.*, 9 P.3d 274, 278 (Alaska 2000).

43. *Borchgrevink v. Borchgrevink*, 941 P.2d 132, 140 (Alaska 1997) (recognizing "the deleterious impact" witnessing domestic violence has on

children); *see also Puddicombe v. Dreka*, 167 P.3d 73, 77 (Alaska 2007); *Williams v. Barbee*, 243 P.3d 995, 1004 (Alaska 2010).

44. *Williams*, 243 P.3d at 1001.

45. Emphasis added.

46. 225 P.3d 1120 (Alaska 2010).

47. *Parson v. State, Dep't of Revenue, Alaska Hous. Fin. Corp.*, 189 P.3d 1032, 1036 (Alaska 2008) (citing *Parker v. Tomera*, 89 P.3d 761, 765 (Alaska 2004)).

batterers, *where reasonably available* . . . [48]

The plain language of .150(h) provides that the presumption against awarding custody to a parent with a history of perpetrating domestic violence *may* be overcome by completing an intervention program for batterers. Had the legislature intended that completion of an intervention program would be the *only* way to overcome the presumption, one would expect the legislature to have used limiting language such as "only." Here, the legislature declined to provide that the *only* way the presumption could be overcome was through the completion of a batterers' intervention program.[49]

The plain language of the statute also impliedly recognizes that batterers' intervention programs may not be reasonably available in all parts of Alaska. The statute provides that the rebuttable presumption may be overcome by completing an intervention program for batterers *"where reasonably available."* [50] We interpret the words "where reasonably available" to be the legislature's recognition and acknowledgment that such programs may not be available throughout the state. Though Stephanie argues strenuously that the only way to overcome the presumption is to complete a batterers' intervention program, the language of the statute does not support her position and it would make little sense that a program that is not available state-wide would be the only way to overcome a presumption the legislature expressly made rebuttable. If completion of an intervention program for batterers were the only way to overcome the statutory presumption, the rebuttable presumption in AS 25.24.150(g) would effectively be an *irrebuttable* one for many rural Alaskan residents. This is contrary to the legislature's unambiguous direction that the presumption should be rebuttable.[51]

The plain language "where reasonably available" supports the conclusion that the legislature did not intend that completion of a batterers' intervention program should be the only way to overcome the rebuttable presumption in AS 25.24.150(g). The plain language of AS 25.24.150(h) indicates that completion of a batterers' intervention program is one way, but not the only way, to overcome the statutory presumption.

### b. The legislative history

The legislative history of AS 25.24.150(g) supports the conclusion that the legislature used the word "may" and included the phrase "where reasonably available" because it did not intend there should be only one way to overcome the statutory presumption. Alaska Statute 25.24.150(g) was based on Louisiana Revised Statute 9:964(A) [52] which states: "The presumption shall be overcome *only* by a preponderance of the evidence that

---

**48.** Emphasis added.

**49.** *See Garrison v. Dixon,* 19 P.3d 1229, 1236 (Alaska 2001) ("The term 'may' generally denotes permissive or discretionary authority.") (quoting *Gerber v. Juneau Bartlett Mem'l Hosp.,* 2 P.3d 74, 76 (Alaska 2000)); *see also* 1A Norman J. Singer & J.D. Shambie Singer, STATUTES & STATUTORY CONSTRUCTION § 25:4 (7th ed. 2009).

**50.** AS 25.24.150(h) (emphasis added).

**51.** At oral argument before our court, Stephanie's counsel was asked how the presumption would be applied in a hypothetical situation where one parent has a history of domestic violence not directed at the children but is otherwise a fit and capable parent, the other parent is a methamphetamine addict, and the court finds by clear and convincing evidence that it would be detrimental for the children to be placed in the custody of the parent with the addiction to methamphetamine. Stephanie's counsel first argued that the children should be placed with the perpetrating parent but under the State's legal custody. Later, Stephanie's counsel conceded that under his interpretation of the statute the children could not be placed with the perpetrating parent until after the program had been completed, leaving foster care or other out-of-home placement as the only option. We see nothing in the language or legislative history of AS 25.24.150(g)-(h) that evidences an intention by the legislature to *require* that children be moved to out-of-home placements without allowing the perpetrating parent the opportunity to show that the statutory presumption had been overcome by means available in rural Alaska. We also reject the possibility that this statutory presumption was intended to be applied differently to Alaskans living in rural areas than it is to Alaskans living in urban areas.

**52.** Minutes, H. Jud. Comm. Hearing on H.B. 385, 23rd Leg., 2nd Sess. (Mar. 1, 2004) (testimony of Allen M. Bailey, Esq.).

the perpetrating parent has successfully completed a treatment program ..." When the Alaska legislature codified its rebuttable presumption against awarding custody to a parent with a history of perpetrating domestic violence, it made two distinct changes to the Louisiana statute. First, it deleted the word "only" and replaced "shall" with the word "may." Second, it added the phrase "where reasonably available." These modifications to the language of the Louisiana statute strongly support the conclusion that the Alaska legislature did not intend for completion of a batterers' intervention program to be the only way to overcome the statutory presumption.

**c. We have not held that there is only one way to overcome the presumption against awarding custody to a parent with a history of perpetrating domestic violence.**

The superior court cited *Wee v. Eggener*[53] as authority for its understanding that completion of a batterers' intervention program is the only way to overcome the rebuttable presumption against awarding custody to a parent with a history of perpetrating domestic violence. But *Wee* did not hold that a batterers' intervention program is the only way to overcome the presumption. *Wee* reversed the superior court's award of joint legal and shared physical custody because the superior court *"failed to address* AS 25.24.150(g)'s presumption against custody."[54] *Wee* cited *Puddicombe v. Dreka*[55] for the rule that "the path charted in subsection .150(g)-(i) must be followed when one parent has a history of domestic violence," but this only means that the rebuttable presumption cannot be ignored by the superior court; it

does not speak to the proof that is needed to rebut the statutory presumption.[56]

We recognized in *O'Dell v. O'Dell* that .150(h) does not expressly state that the presumption in .150(g) may only be overcome by completing a batterers' intervention program: "the text of subsection .150(h) is not completely unambiguous in explaining what a 'perpetrating parent' must do to overcome the presumption against custody."[57] The ruling we issue today was foreshadowed by *O'Dell*'s holding that "it was not legal error [for the superior court] to conclude that an anger management program that includes domestic violence counseling satisfies the statute."[58]

Until now, we have not definitively answered whether a batterers' intervention program is the only way to overcome the rebuttable presumption; our previous case law only reiterates the statutory provision that a parent *may* or *can* rebut the presumption by completing an intervention program for batterers.[59] The present case squarely presents the issue, and we now hold that the rebuttable presumption in AS 25.24.150(g) may be overcome by means other than the completion of an intervention program for batterers. The plain language of the statute and its legislative history support this conclusion.

**C. The Presumption Does Not Raise Constitutional Concerns.**

The superior court's conclusion that application of the presumption in .150(g) would violate George's and the children's right to due process was premised on its understanding that the presumption prevented the superior court from considering the other best

---

53. 225 P.3d 1120 (Alaska 2010).

54. *Id.* at 1125 (emphasis added).

55. 167 P.3d 73 (Alaska 2007).

56. 225 P.3d at 1125.

57. Mem. Op. & J., 2007 WL 1378153 at *5 (Alaska May 9, 2007).

58. *Id.*

59. *See Misyura v. Misyura*, 242 P.3d 1037, 1040–41 (Alaska 2010) ("If AS 25.24.150(g)'s presump-

tion applies, it *can* be overcome if the perpetrating parent shows by a preponderance of the evidence that he or she has 'successfully completed an intervention program for batterers [and] ... does not engage in substance abuse.'") (quoting AS 25.24.150(h)) (emphasis added); *see Michele M. v. Richard R.*, 177 P.3d 830, 838 (Alaska 2008) (stating that the "presumption *can* be overcome if a parent has met certain requirements, such as attending a program for batterers and not engaging in substance abuse") (emphasis added).

interests factors enumerated in AS 25.24.150(c). Because there is more than one way to overcome the rebuttable presumption, and because the statute permits consideration of all the best interest factors, we see no risk that application of AS 25.24.150(g)-(h) will infringe upon a constitutionally protected right. The resolution of this case lies in the straightforward consideration of the "path" charted in subsection .150(g)-(h) and an analysis of the children's best interests.

### 1. The path charted by AS 25.24.150(g)-(h)

The superior court followed the first step in the statutory path when it found that George engaged in two acts of domestic violence. Next, the superior court correctly ruled that George's two acts of domestic violence triggered the rebuttable presumption in .150(g). The third step is consideration of whether the presumption was rebutted under .150(h). The superior court held a separate evidentiary hearing where George argued that the presumption had been overcome. Because the superior court concluded that AS 25.24.150(h) only allowed one way for the presumption to be rebutted—the completion of a batterers' intervention program—it ruled that the presumption had not been overcome. As we have explained, this was error and we remand this case so the superior court may determine whether the presumption was rebutted by the steps George took to address his history of domestic violence.

We are mindful that this case has become very protracted, and the decision we issue today does not suggest that the court must take additional evidence. The record includes the evidence presented at a two-day hearing held for the sole purpose of evaluating whether the steps George took to respond to his acts of domestic violence allowed him to overcome the presumption. Both parties had notice and the opportunity to present evidence and argument on this issue, and both had the opportunity to cross-examine

the witnesses called by the opposing party. The superior court found that George had completed twelve weeks of one-on-one therapy. It found that he made significant progress to "understand and change his behavior," and improve his empathy skills. George's therapist testified that traditional batterers' intervention group sessions would be "contraindicated" in George's case and "could be more detrimental than productive." After hearing extensive lay testimony and expert testimony, the court made detailed findings about the nature of George's domestic violence, concluding that "[George's] acts of domestic violence were not tools used to effectuate a strategy of control, overbearing power, or manipulation. Instead they were acts of situational violence and unlikely to reoccur." As explained, the court is entitled to significant deference when making this type of determination.[60] Though the superior court ruled that the counseling George received was not comparable to the completion of a batterers' intervention program, the superior court has not decided whether the counseling was sufficient to rebut the statutory presumption. This question should be addressed on remand.

If the superior court decides on remand that the presumption has been rebutted, the final step in the path charted by the legislature will be consideration of the best interest factors in AS 25.24.150(c) to make a final custody decision. Even if a parent with a history of domestic violence overcomes the statutory presumption, he or she is not necessarily entitled to custody; a complete analysis of the best interest factors must be undertaken. When the court considers the child's or children's best interests at this stage, the court is not precluded from *considering* the perpetrating parent's history of domestic violence. But if the presumption has been overcome, the history of domestic violence does not *prevent* the court from awarding custody to the perpetrating parent where doing so serves the children's best interests.

---

**60.** Considering the character or type of domestic violence for purposes of determining whether the presumption has been rebutted under .150(h) is not to be confused with determining whether the presumption was triggered under .150(g). Any two acts of domestic violence, or one causing serious physical injury, trigger the rebuttable presumption against awarding custody to a person with a history of perpetrating domestic violence. AS 25.24.150(g).

To resolve the questions presented in this appeal, it is sufficient for our court to decide that the legislature's adoption of AS 25.24.150(g)-(h) did not prevent the superior court from considering the children's best interests, that the superior court did not abuse its discretion when it made a "best interests" determination in this case, and that the rebuttable presumption in .150(g) does not raise due process concerns.

## V. CONCLUSION

We REMAND this case so the superior court may consider whether George rebutted the presumption in .150(g).