*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JOY B., | ) | |
| | ) | Supreme Court No. S-17129 |
| Appellant, | ) | |
| | ) | Superior Court No. 2KB-16-00047 CI |
| v. | ) | |
| | ) | O P I N I O N |
| EVERETT B., | ) | |
| | ) | No. 7417 – November 1, 2019 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Second Judicial District, Kotzebue, Paul A. Roetman, Judge.

Appearances: Bonnie J. Coghlan, Downes, Tallerico, & Schwalm Law Firm, LLC, Fairbanks, for Appellant. Terri-Lynn Coleman, Law Office of Rita T. Allee, P.C., Fairbanks, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

MAASSEN, Justice.

## I. INTRODUCTION

A married couple with a ten-year-old son separated in 2014. Following an evidentiary hearing on temporary orders, the trial court found that the father had a history of perpetrating domestic violence and ordered him to complete an intervention program for batterers before he would be allowed unsupervised visitation with the child.

At the later custody trial, the director of the intervention program testified that the father had sought entry to the program but had been determined to be unsuited for it because he was a victim of domestic violence rather than a perpetrator. The custody investigator's report confirmed these conclusions and recommended that the father be granted sole legal and primary physical custody of the child because of the mother's coercive influence and her inability to meet the child's mental and emotional needs.

Relying primarily on the testimony of the batterers' program director and the custody investigator, the trial court concluded that the father had overcome the statutory presumption against awarding custody to a parent with a history of perpetrating domestic violence and followed the investigator's recommendation, granting the father sole legal and primary physical custody of the child. The mother, on appeal, challenges this decision, arguing that the evidence did not support a conclusion that the statutory presumption was overcome because the father never received any treatment or therapy.

We conclude that the trial court could lawfully consider the expert testimony that the father was not suited for a batterers' intervention program when deciding whether the statutory presumption against awarding him custody was overcome. We also conclude that the court did not clearly err or abuse its discretion in its consideration of the child's best interests. We therefore affirm the trial court's custody decision.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Joy B. and Everett B. were married in 1998.[1] Ten years later they became

---

[1]    We use pseudonyms to protect the parties' privacy.

the parents of twins, one of whom died of Sudden Infant Death Syndrome at only 21 days old.

The marriage was turbulent. Joy claimed that Everett was unfaithful and that he committed acts of domestic violence; she later came to blame Everett for the death of their child. Everett admitted to an affair but claimed that Joy abused him emotionally and physically, once even hiring an assassin to kill him. The parties separated in May 2014. Everett filed for divorce in December 2015, asking for shared legal and primary physical custody of their child. Joy asked for sole legal and primary physical custody.

### B. Proceedings

In May 2016 the trial court held a hearing on temporary orders. The court found that "it was more likely than not that [Everett] has a history of perpetrating domestic violence," based on two occasions when Everett placed Joy in "reasonable fear of bodily harm": in one incident he destroyed a child gate in front of Joy and the child, but the other incident was not identified. The court held that under AS 25.24.150(j), Everett could not have unsupervised visitation until he completed "an intervention program for batterers and a parenting education program." The court awarded Joy interim sole legal custody and primary physical custody and limited Everett to supervised visitation.

Shortly thereafter Everett met with Lisa Hay, a licensed clinical social worker, who performed an intake assessment for a batterers' intervention program. Hay concluded that Everett was not a perpetrator of domestic violence but rather a victim, and that he was therefore "not appropriate for our program." The court also appointed a custody investigator, who filed a lengthy report based on her observations of the parents and her review of records such as the parents' text messages and psychological assessments. The investigator's conclusions mirrored those of Hay: Everett was

"passive and avoidant," whereas Joy was "aggressive and domineering" and "engaged in long-standing patterns of battering through coercion, control, manipulation and domination over [Everett] physically and psychologically." The investigator found that these behaviors prompted concerns about the child's "current well-being and whether his needs are being met." She recommended that Everett have sole legal and primary physical custody of the child and that Joy have "supervised weekly Skype visits" and enroll in cognitive behavioral therapy.

Trial was held over several days in early 2018. Joy and Everett both testified, along with Hay, the custody investigator, Joy's retained expert in custody investigations (who critiqued the custody investigator's report), Everett's current domestic partner, an acquaintance of Joy's, and a psychologist who had evaluated Everett's mental state on the custody investigator's referral. The court memorialized its decision in a summary order that largely accepted the custody investigator's recommendations, awarding Everett sole legal and primary physical custody and giving Joy supervised visits while ordering her to enroll in cognitive behavioral therapy.

The court more fully explained its decision in a later final custody order. The court declined to change its interim finding that Everett had perpetrated domestic violence; however, it found that "[Everett's] breaking the baby gate was 'situational violence' and not pattern violence" and that Joy, on the other hand, was a "perpetrator of domestic violence" through "intimate partner stalking behaviors" and "ongoing harassment behaviors" designed to give her "coercive control" over both Everett and the child. The court found by a preponderance of the evidence that Everett had "overcome the rebuttable presumption that previously prohibited a custody award to him," based on the facts that "[Everett] was not recommended for [the] DV batterers['] program," "he does not engage in substance abuse," and "the best interests of the child require his participation as a custodial parent."

Joy appeals. She challenges the court's decision that Everett overcame the statutory presumption against awarding him custody, its decision that awarding custody to Everett was in the child's best interests, and its decision to condition her unsupervised visitation on the substantial completion of mental health treatment.

## III.   STANDARD OF REVIEW

The trial court has broad discretion in child custody matters, and its decision "will be set aside only if the entire record demonstrates that the controlling findings of fact are clearly erroneous or that the trial court abused its discretion."[2]  "A finding of fact is clearly erroneous when this court is left with a definite and firm conviction that the trial court has made a mistake."[3]  "Abuse of discretion is established if the trial court considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others."[4]

"Whether the [trial] court applied the correct standard in a custody determination is a question of law we review de novo, determining the rule of law in light of precedent, reason, and policy."[5]  We review de novo whether a superior court's findings satisfy statutory requirements."[6]

---

[2]   *Hamilton v. Hamilton*, 42 P.3d 1107, 1111 (Alaska 2002).

[3]   *Id.*

[4]   *Id.*

[5]   *Moeller-Prokosch v. Prokosch*, 27 P.3d 314, 316 (Alaska 2001).

[6]   *Timothy W. v. Julia M.*, 403 P.3d 1095, 1100 (Alaska 2017) (quoting *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 210 (Alaska 2010)).

## IV. DISCUSSION

### A. The Trial Court Did Not Clearly Err By Finding That Everett Rebutted The Statutory Presumption Against Awarding Him Custody.

Alaska Statute 25.24.150(g) imposes "a rebuttable presumption that a parent who has a history of perpetrating domestic violence against the other parent, a child, or a domestic living partner may not be awarded sole legal custody, sole physical custody, joint legal custody, or joint physical custody of a child." Subsection (h) of the statute provides that "[t]he presumption may be overcome" if three conditions are met: (1) "the perpetrating parent has successfully completed an intervention program for batterers, where reasonably available"; (2) "the parent does not engage in substance abuse"; and (3) "the best interests of the child require that parent's participation as a custodial parent because the other parent is absent, suffers from a diagnosed mental illness that affects parenting abilities, or engages in substance abuse that affects parenting abilities, or because of other circumstances that affect the best interests of the child." These three conditions for overcoming the presumption must be proven by a preponderance of the evidence.[7]

#### 1. The trial court did not err by relying on evidence that Everett had applied for entry to a batterers' program but was found unsuited for it.

Following the custody trial the court reaffirmed its earlier determination that Everett had a history of perpetrating domestic violence; this kept in place the statutory presumption against awarding him custody. The custody investigator had recommended that the court apply the statutory analysis governing situations in which *both* parents have histories of perpetrating domestic violence; in such circumstances the court should award custody "to the parent who is less likely to continue to perpetrate the

---

[7] AS 25.24.150(h).

violence and require that the custodial parent complete a treatment program," or, if necessary, award custody "to a suitable third person."[8]  But the court declined to find, "at this time, that [Joy] has a history of perpetrating domestic violence."  Instead, the court found that Everett had met the three conditions necessary for overcoming the statutory presumption.  The court reasoned that (1) "[Everett] was not recommended for [a domestic violence] batterers['] program," (2) "he does not engage in substance abuse," and (3) "the best interests of the child require his participation as a custodial parent."

Joy argues that the court's finding on the first element — that Everett had not been recommended for a batterers' program — failed to satisfy the element's express requirement:  successful completion of "an intervention program for batterers, where reasonably available."[9]  She notes that when deciding interim custody, the court had "ordered [Everett] to complete a batterer[s'] program and a parenting education program" before he could have unsupervised visitation, but "[h]e did neither."  The question we must decide is whether the court could lawfully conclude that Everett satisfied the presumption's first condition with evidence that he asked to be admitted to a batterers' program but, having been examined by an expert as part of the intake process, "was not recommended for" the program because he posed no risk of committing domestic violence in the future.

In *Stephanie F. v. George C.* we held "that the rebuttable presumption in AS 25.24.150(g) may be overcome by means other than the completion of an intervention program for batterers."[10]  We reached this conclusion after close analysis of the statutory language and legislative history:  the statute says that the presumption "*may*

---

[8]     AS 25.24.150(i).

[9]     AS 25.24.150(h).

[10]    270 P.3d 737, 753 (Alaska 2012).

be overcome by completing an intervention program for batterers,"[11] and the legislature omitted potentially limiting language such as "shall be overcome *only*," as used in the Louisiana statute on which Alaska's was based.[12] In *Stephanie F.*, much like here, the husband's therapist testified that "traditional batterers' intervention group sessions would be 'contraindicated' in [the husband's] case and 'could be more detrimental than productive.' "[13] The husband had, however, completed "twelve weeks of one-on-one therapy," during which "he made significant progress to 'understand and change his behavior[]' and improve his empathy skills," though the superior court found that this counseling "was not comparable to the completion of a batterers' intervention program."[14] We remanded the case for the superior court to determine "whether the counseling was sufficient to rebut the statutory presumption."[15]

In this case the court found that Everett's attorney had referred him to LEAP, Inc., "a state-approved alternative to violence program," "to do an intake assessment to determine if he would be appropriate for their batterers['] intervention program." Everett accordingly went to LEAP's offices and asked to be admitted to the "Alternatives to Violence program." He was then professionally evaluated by Hay, the program's executive director and a licensed clinical social worker, who at trial "was qualified as an expert in the area of behavioral risk assessment evaluations for men and women related to the LEAP[,] Inc. Program." Hay evaluated Everett using a variety of

---

[11]    AS 23.30.150(g) (empahsis added).

[12]    *Stephanie F.*, 270 P.3d at 752-53 (emphasis in original) (quoting Louisiana Revised Statute 9:964(A)).

[13]    *Id.* at 754.

[14]    *Id.*

[15]    *Id.*

testing techniques, including a "Behavior Inventories" assessment, an Adverse Childhood Experiences Study questionnaire, and an Ontario Domestic Abuse Risk Assessment. She also relied on interviews of Everett, Joy, Everett's current girlfriend, and a co-worker and reviewed several years of Everett's private journal entries. Hay determined that Joy was a highly controlling and abusive partner in the marriage, whereas Everett was largely passive and fearful. Finding that Joy was the perpetrator of domestic violence in the relationship through "psychological and emotional abuse," Hay concluded that "[Everett] was not appropriate for the batterer[s'] intervention program male offenders group, because he was a victim of domestic violence and would be eligible for counseling." The court specifically found that Hay's LEAP report "was credible and was an appropriately conducted behavioral risk assessment that once completed confirmed [Hay's] initial assessment that [Everett] was not the perpetrator of domestic violence."

The custody investigator's report reached much the same conclusions: that Joy engaged in "intimate partner stalking behaviors which [are] a form of domestic violence" as well as "ongoing harassment behaviors" that were "accusatory, blaming, insulting, shaming, belittling, and threat[en]ing." The court agreed with the investigator's conclusion that Joy exercised "a form of coercive control" over Everett that "amounted to mental and emotional abuse" of both Everett and the child and that this made Joy a "perpetrator of domestic violence."

The court qualified its discussion of domestic violence on Joy's part, however. While it found that Joy had "engaged in coercive psychological abuse," the court found that "the claims of physical abuse were [not] corroborated." Observing that "the parties [had] not presented the [c]ourt with argument that [Joy's] psychological abuse alone amounts to a history of perpetrating domestic violence," the court concluded that it therefore could not "find that [Joy] has a history of perpetrating domestic

violence." We note the apparent conflict between this finding and the court's earlier agreement with the investigator that Joy was a "perpetrator of domestic violence," based on conduct that was "ongoing," "during the relationship and continuing afterwards," and "over time . . . amounted to mental and emotional abuse towards both [Everett and the child]." If Joy was a "perpetrator of domestic violence," then the court's findings may support the conclusion that her conduct amounted to "a history of domestic violence." But the court did not analyze Joy's stalking or "harassment behaviors" in the context of any specific statutes by which domestic violence is defined.[16] We consider it unnecessary to do so either, because we find no error in the trial court's conclusion that Everett rebutted the presumption that he could not be awarded custody.

We do not read the first condition for overcoming the presumption — successful completion of "an intervention program for batterers" — as intending to require an empty exercise. The purpose of the presumption is "to protect children from potentially adverse custody determinations," specifically "to decrease the likelihood that children [will] be placed in the custodial household where domestic violence exists."[17] Here, the evidence supports the trial court's finding — based on the opinions of an expert in batterers' programs and a custody investigator, both of whom the court specifically found credible — that Everett poses no threat of committing

---

[16] AS 25.90.010 provides that in Title 25, "domestic violence" has the meaning given in AS 18.66.990, which defines the term to include crimes against the person, burglary, criminal trespass, arson, criminal mischief, terrorist threats, violating a protective order, harassment, and cruelty to animals. We recognize that the definition of domestic violence used by a therapist to determine whether someone might benefit from a batterers' intervention program may differ from that used by a court based on the governing law.

[17] *Williams v. Barbee*, 243 P.3d 995, 1001 & nn.25-26 (Alaska 2010) (citing House Bill 385, 23d Leg., 2d Sess. (2004) and supporting legislative history).

domestic violence and therefore did not need, and would not in fact benefit from, a batterers' intervention program. Importantly, he sought to enroll in the program as directed but was found to be ineligible. The statutory purpose was thus satisfied. We conclude that under these circumstances the court did not err in deciding that the presumption had been "overcome by means other than the completion of an intervention program for batterers," as contemplated by *Stephanie F.*[18]

### 2. A court may consider the nature of the domestic violence when deciding whether the presumption against awarding custody to the perpetrator has been overcome.

Joy contends that the trial court impermissibly minimized Everett's history of perpetrating domestic violence in order to lower the bar he had to cross to rebut the presumption. She contends that the court relied too heavily on the testimony and reports of Hay and the custody investigator, who "substitut[ed] their own definition of what it means to have a history of perpetrating domestic violence" for the statutory language by concluding that Everett's acts were "situational" and therefore not that serious. But we have repeatedly recognized that trial courts may consider the "situational" nature of domestic violence when deciding whether the presumption applies and whether it has been overcome.

In *Stephanie F.*, for example, the superior court accepted an expert's testimony that the husband's acts of domestic violence amounted to "situational violence as [a] result of a high conflict" rather than " 'a pattern of intimate partner violence[,]' which [the expert] defined as a 'pattern of control, [or] intimidation, often solidified through some type of violence by one partner over the other.' "[19] We held that it was appropriate for the court to consider the violence's situational nature when "determining

---

[18]     270 P.3d at 753.

[19]     *Id.* at 749.

whether [the husband] overcame the statutory presumption and gauging the risk of future violence. *This difficult and important assessment is one best made by the trial court.*"[20]

In *Mallory D. v. Malcolm D.* the superior court found that each parent had committed two acts of domestic violence and therefore each had "a history of domestic violence" as defined in AS 25.24.150(h).[21] Under these circumstances — when the court finds that "both parents have a history of perpetrating domestic violence" — the controlling statute is AS 25.24.150(i), which requires the court to "award sole legal and physical custody to the parent who is less likely to continue to perpetrate the violence." The superior court in *Mallory D.* determined, however, that neither party was less likely than the other to commit further acts of violence; it found that the parents' acts were "equal," situational, and unlikely to recur.[22] It determined, therefore, that the presumption against an award of custody did not apply to either parent and that it was "free to fashion a custody decree that meets the best interests of the children."[23] We saw no clear error in the court's findings of fact and agreed with its legal analysis.[24] In so doing we "emphasize[d] that the trial court must take a qualitative approach when considering the nature and extent of the domestic violence committed by both parents rather than merely counting the number of domestic violence occurrences to determine

---

[20] *Id.* (emphasis added); *see also id.* at 754 (noting that trial court "is entitled to significant deference" when determining that acts of domestic violence "were not tools used to effectuate a strategy of control, overbearing power, or manipulation" but rather "were acts of situational violence and unlikely to reoccur").

[21] 290 P.3d 1194, 1206 (Alaska 2012).

[22] *Id.* at 1206-07 & n.28.

[23] *Id.* at 1206 (quoting trial court decision).

[24] *Id.* at 1206-07.

whether the rebuttable presumption in AS 25.24.150(g) applies."[25]  We observed that, for example, "two heinous acts" by one parent should not be weighed the same as "two comparatively minor incidents" by the other parent when determining whether the presumption applies.[26]

We conclude that the trial court did not err when it considered the seriousness of Everett's incidents of domestic violence — and specifically their situational nature — in the context of deciding whether he had overcome the presumption against awarding him custody of the parties' child.

**B.    The Trial Court Did Not Clearly Err Or Abuse Its Discretion By Determining That It Was In The Child's Best Interests To Be In Everett's Sole Custody.**

Joy also challenges the trial court's determination that it was in the child's best interests to award Everett sole legal and primary physical custody; she highlights the facts that she was the child's primary caregiver up to the time of trial and that awarding custody to Everett in California would uproot the child from "his lifetime home in Kotzebue."  Joy again contends that the trial court relied too heavily on the recommendations of Hay and the custody investigator, particularly their conclusions "that [Joy] was a perpetrator [of] domestic violence and [Everett] the victim," findings that "carried over into the court['s] consideration of the [other] best interest[s] factors."

---

[25]    *Id.* at 1207.

[26]    *Id.*; *see also Dennis Q. v. Monika M.*, No. S-15084, 2014 WL 1888270, at *7 (Alaska May 7, 2014) (noting in context of AS 25.24.150(i) — applicable when "both parents have a history of perpetrating domestic violence" — that "the severity of the [parents'] assaults is a reasonable factor for making a difficult prediction about future behavior" and "is especially appropriate" in light of findings that wife's violence was "situational to the relationship and circumstances" whereas husband's was "typical of the violence seen where a person is using force to exert power and control over another").

When making an award of child custody, courts are required to consider the best interests factors listed in AS 25.24.150(c):

(1) the physical, emotional, mental, religious, and social needs of the child;

(2) the capability and desire of each parent to meet these needs;

(3) the child's preference if the child is of sufficient age and capacity to form a preference;

(4) the love and affection existing between the child and each parent;

(5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;

(6) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, except that the court may not consider this willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in domestic violence against the parent or a child, and that a continuing relationship with the other parent will endanger the health or safety of either the parent or the child;

(7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;

(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;

(9) other factors that the court considers pertinent.

"In awarding custody the court may consider only those facts that directly affect the

well-being of the child."[27]

The trial court considered each of these best interests factors in turn. Joy argues that the court "overlooked pertinent factors," "considered improper factors[,] . . . and assigned disproportionate weight to particular factors." Her arguments directly challenging the court's findings on domestic violence are answered in the discussion above. We analyze her other arguments in turn.

Joy challenges the trial court's agreement with the custody investigator that the "dynamic" of "parental alienation" was "apparent in this case"; this finding supported the court's conclusion in its discussion of factor (6) that Joy was less willing than Everett to foster the child's relationship with the other parent. Joy contends that there is no evidence to show that the child "is alienated from either parent"; she argues that the child "was happy to see his father" and "was at ease in the company of both parents." The trial court acknowledged the absence of expert testimony on this issue, but it reasoned that "the record presents a mound of evidence from which the [c]ourt can fairly easily draw conclusions about the relationship that are characteristic of the parental alienation dynamic." The court cited the facts that Joy "has prevented and frustrated [Everett's] visitation in the past"; that she "has been controlling of how visits with [Everett] occur," limiting contact to "email, not phone or video [S]kype"; that she "sees her relationship with [Everett] as a package deal, i.e., 'If you want me, you get son too, if you don't want me, then you don't get son either' "; that "numerous texts and emails" indicate her "angry view of [Everett]" and her negative comments about his contact with the child; and that despite "her [expressed] desire to foster a relationship between father and son, [she] effectively makes visitation and interactions between father and son difficult." These findings of fact are supported by Everett's trial testimony, the credibility of which

---

[27]     AS 25.24.150(d).

was for the trial court to determine,[28] as well as the LEAP report and the custody report. Given its underlying factual findings, which are not clearly erroneous, the court's use of the diagnostic label "parental alienation" to summarize its thoughts on the issue does not persuade us that it abused its discretion when weighing factor (6).

Joy argues that the trial court also erred when weighing factor (7) — "any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents" — because it considered what it termed Joy's "stalking type behavior." Joy argues that her behavior does not meet the definitions of "domestic violence, child abuse, or child neglect" and that there was no showing that it "directly affect[ed] the well-being of the child."[29] But as explained above, the court made findings — supported by the evidence — that Joy's behavior interfered with the relationship between Everett and the child. And even if Joy's behavior did not amount to "domestic violence, child abuse, or child neglect," the court was entitled to consider it under the catch-all factor of AS 25.24.150(c)(9): "other factors that the court considers pertinent." We see no error in the court's consideration of Joy's "stalking type behavior" in reaching its custody decision.

Joy also argues that the trial court erred in its discussion of factors (1) and (2) — the child's needs and the parents' "capability and desire . . . to meet these needs" — when it criticized Joy "for not always obtaining the medical care the custody investigator believed the child needed." Joy contends that "many of the alleged failings occurred while the parents were living together, making it difficult to assign responsibility to only the mother." But in fact a majority of the incidents identified by

---

[28]     *Ebertz v. Ebertz*, 113 P.3d 643, 646 (Alaska 2005).

[29]     *See* AS 25.24.150(d) ("In awarding custody the court may consider only those facts that directly affect the well-being of the child.").

the custody investigator, involving recommendations for circumcision and a tonsillectomy, occurred in 2015 and 2016, after the couple separated and while the child was in Joy's sole care. We therefore see no clear error in the court's assignment of responsibility to her.

Joy takes issue in a sentence or two with several other aspects of the court's best interests determination. She asserts that the court "gave no weight to [Everett's] failure to provide financial support." It is true that the court did not address this issue directly, but one exhibit at trial was Everett's record of child support payments, about which he was questioned briefly. He admitted that he was in arrears but testified that he was working on getting caught up. There is nothing in the record or in Joy's cursory mention of the issue that makes us believe the court should have given it significant weight.

Joy argues that the trial court "ignored [Everett's] lack of contact with his son" and that his failure to maintain closer contact despite Joy's perceived resistance demonstrates a lack of interest. The court did not ignore these issues; rather, it grappled with them in the course of reaching its decision. The court noted that "[e]valuating [Everett's] desire to raise [the child] is initially hard since he has not made many attempts to visit his son, though there have been apparent difficulties in communicating with [Joy]." The court expressly disagreed with Joy that Everett's failure to visit was because he did not want to spend time with the child: "The [c]ourt disagrees with this characterization in light of the evidence that [Everett] had made attempts to visit his son in Kotzebue and in Maine, but these efforts [were] not always met with support . . . [and] may have been difficult to undertake in the face of a domineering wife that he perceived as having apparent control of their son's availability." The court concluded that the evidence "indicates that [Everett and the child] have a rapport and familiarity that can be

built upon with more time and opportunity, free from [Joy's] control and influence." We see no clear error in these findings of fact.

Joy also argues that the court ignored how well the child was doing in school and in the Kotzebue community while in her care. But the court did recognize this, observing that "[Joy] has generally been successful in raising" the child and "has generally demonstrated capability and desire to meet most of [the child's] needs." The court's concern was for "[Joy's] capacity to emotionally support" the child; it determined that "the current home in Kotzebue with [Joy] is not suitable for [the child] at present, since his emotional needs are not being met and he has experienced, and continues to hear and see firsthand, [Joy's] negative views towards [Everett]." Weighing the importance of the child's social and educational needs on the one hand and his emotional needs on the other is a matter committed to the trial court's discretion.[30] The court did not abuse that discretion by prioritizing the child's emotional needs over others.

Finally, Joy contends that the trial court did not "meaningfully consider[] the emotional impact [that] a move would have on a child required to move thousands of miles from the only home he has known to live with a parent who has been absent from his life for three years." But again, the court did seriously consider this aspect of the situation, recognizing that the child "has lived in the marital home throughout his life." The court concluded, however, that maintaining continuity was less important than meeting the child's emotional and mental needs, which could best be accomplished by

---

[30] *See Michele M. v. Richard R.*, 177 P.3d 830, 834 (Alaska 2008) (finding no abuse of discretion in superior court's "emphasis on [the child's] education, identifying it as one of [the child's] greatest needs under AS 25.24.150(c)(1)").

a change in custody. We see no clear error in the court's findings related to this issue or any abuse of discretion in its weighing of the child's needs.

### C. The Court Did Not Abuse Its Discretion By Placing Conditions On Joy's Visitation.

Finally, Joy contends that the superior court abused its discretion when it accepted the custody investigator's recommendation that a change of custody was necessary until Joy was

> able to obtain services to cope with her own issues[,] . . . to gain a better understanding of her own behaviors and faulty thinking, to take responsibility for her own vindictive actions that have negatively impacted the child, to learn new methods of resolving her emotions, to learn appropriate communication that disengages from conflict, and to be willing to encourage the child's relationship [with] his father and not engage the child in disparaging comments or conduct.

The court was much more specific about the contemplated services in a summary order on child custody, in which it ordered, as a condition of unsupervised visitation, that Joy enroll "in individual cognitive behavioral therapy (CBT) . . . to process issues including, but not limited to, the loss of the parties' [other] child . . . ; to find ways to cope with the loss of the marriage and the issues involved in the marriage; the use of manipulation/coercion/threats/control in relationships/divorce/parenting, and appropriate communication with the child about [Everett]." The court continued: "The therapist should be well versed in CBT and have an in-depth understanding of personality disorders, high conflict divorce, and coercive control battering within intimate partner relationships."

Joy argues that the sole source of this detailed order was the report of the custody investigator, whose only expertise was in custody investigations and who admitted that she was unqualified to make a psychological diagnosis. She argues that the

court therefore erred when it relied on the investigator's analysis of Joy's "mental condition" and adopted the investigator's specific recommendations for treatment.

The trial court has broad discretion when formulating conditions on a parent's exercise of visitation.[31] We have affirmed a trial court's decision to condition unsupervised visitation on completion of a psychological evaluation when based on a finding that the father was otherwise "likely to surround his son with 'an atmosphere of conflict, paranoia, upset, anger[,] and stress.' "[32] Here, the custody investigator testified that she was not making any psychological diagnosis but rather was drawing on her experience to make a recommendation she thought might be of benefit to the family. Joy's argument that the investigator was unqualified to recommend a specific type of therapy is conclusory and does not persuade us that the trial court abused its broad discretion by incorporating the recommendation into its custody order.[33]

## V. CONCLUSION

We AFFIRM the trial court's decision on custody.

---

[31] *Pasley v. Pasley*, 442 P.3d 738, 754 n.81 (Alaska 2019); *Yelena R. v. George R.*, 326 P.3d 989, 1002 n.36 (Alaska 2014) ("[W]here a trial court makes the required findings, whether those findings support a particular restriction on visitation is left to the trial court's discretion.").

[32] *Sagers v. Sackinger*, 318 P.3d 860, 866-67 (Alaska 2014) (affirming trial court's requirement that father undergo psychological evaluation before having unsupervised visitation).

[33] Joy also argues that the trial court's condition restricting her to supervised visitation was unsupported by the evidence. But because she first raises the argument in her reply brief, we deem it waived. *See Barnett v. Barnett*, 238 P.3d 594, 603 (Alaska 2010). We do note that the trial court clearly laid out a plan by which Joy could achieve unsupervised visitation: the "substantial completion" of its recommendations for a psychological evaluation and individual cognitive behavioral therapy. *See Georgette S.B. v. Scott B.*, 433 P.3d 1165, 1172 (Alaska 2018).