NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

|  |  |  |
|---|---|---|
| SARAH B., | ) | |
| | ) | Supreme Court No. S-17742 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-17-06859 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| EDWARD H., | ) | AND JUDGMENT* |
| | ) | |
| Appellee. | ) | No. 1819 – February 24, 2021 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Yvonne Lamoureux, Judge.

Appearances: Kara A. Nyquist, Anchorage, for Appellant. Notice of nonparticipation filed by Jacob A. Sonneborn, Law Office of Jacob Sonneborn, Anchorage, for Appellee.

Before: Winfree, Maassen, and Carney, Justices. [Bolger, Chief Justice, not participating.]

## I.    INTRODUCTION

A mother appeals the superior court's order modifying custody and requiring her to demonstrate a long-term commitment to sobriety before she may regain shared physical custody of her children. The mother contends that the superior court

---

\*       Entered under Alaska Appellate Rule 214.

made some clear errors of fact, abused its discretion when weighing the statutory best interests factors, and unreasonably restricted visitation.

We conclude that the court did not clearly err in its findings of fact or abuse its discretion in weighing the best interests factors. We also conclude that the court did not abuse its discretion in limiting visitation while anticipating future requests to modify custody as the mother's recovery progressed. We therefore affirm the court's order modifying custody.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

After their divorce in December 2018, Sarah B. and Edward H. had joint legal custody and shared physical custody, week-on/week-off, of their two daughters.[1] The parties' relationship is difficult; the superior court described this as a "high-conflict" case.

Sarah has a history of alcohol abuse with periods of sobriety and relapse. The custody modification order now on appeal followed an incident at Sarah's house in September 2019, during her custodial week. Sarah told the girls she was going out for a bit to see a friend. She later testified that she was gone for about an hour and a half and had two glasses of wine. When she came home she was sick and began vomiting; the girls called Edward out of concern that "something [was] wrong" with Sarah.

When Edward arrived he took a video of what ensued. The superior court judge described what she saw on the video:

> [Edward] approached the home. One of the children let him in, and [Sarah] was extremely angry and defensive and immediately . . . started cussing at [Edward] in the presence

---

[1]    We use initials to protect the parties' privacy.

of the children and . . . proceeded, during the course of the next 15 minutes or so, to engage in name-calling at [Edward].

Edward encouraged the children to leave with him, and Sarah followed them out to his car. As the court described the recorded scene:

The children were extremely distraught during this incident. You can hear the children crying. You can hear the older child yelling also and engaging in the name-calling. And so the older child can be heard saying, "Shut up, Mom." And [Sarah] responds, "No, you shut up." [T]he older child calls [Sarah] a crazy lady.

Eventually the children got in the car. One of them said, "I just want to die," as Edward drove away with them.

The next day Sarah found an out-of-state residential treatment facility that could address both substance abuse and trauma, and she entered a two-week program. This was an unusually short duration for the treatment, but Sarah later explained that she wanted a compressed schedule because of her work and her need to care for the children. After returning to Alaska she remained sober, attending at least five Alcoholics Anonymous meetings per week and submitting to daily random alcohol tests. At the time of the evidentiary hearing, she had been sober for six weeks.

B.      Proceedings

Edward filed a motion to modify custody about two weeks after the incident at Sarah's house. He sought temporary sole legal and primary physical custody of the children. He asserted that he was "not interested in taking custody away from Sarah" but believed that she could not "safely parent the children until she receive[d] treatment for her ongoing alcohol addiction and demonstrate[d] her ability to stay sober."

Sarah opposed the motion. She said in her affidavit that she "t[ook] full responsibility" for the incident at her house. She contended that her in-patient treatment

coupled with her sobriety plan were sufficient to ensure the children's safety and that continuing a 50/50 custody schedule was in their best interests.

### 1. Interim custody and the evidentiary hearing

Pending an evidentiary hearing on Edward's motion, the court issued an interim order granting Edward primary physical custody, followed by another order requiring that Sarah's visits be supervised. The evidentiary hearing took place over two days in November. Both parties testified, as did Sarah's current therapist and a therapist who had worked with her during residential treatment. The video of the September incident was entered into evidence.

Edward testified that both children had earlier struggled with their behavior at school, but they had not had any disciplinary problems in the six weeks they were in his sole custody. He told the court that the children had been seeing a therapist, who recommended continuing therapy for the older child. Edward's main concern was Sarah's alcoholism; he testified that he did not believe she was committed to recovery. He recognized the importance of Sarah's role in the children's lives, but he believed that she was unable to properly care for them while she was drinking.

In her testimony, Sarah described her struggle with alcohol abuse and gave her perspective of the September incident. She admitted that it was "just terrible" and "awful" but testified that either parent could have ended it at any time. She disputed that she was drunk and testified that she believed the children were safe at her house that evening. She accused Edward of being verbally abusive, both before and after their divorce. She asked the court to continue the 50/50 shared physical custody, contending that she was committed to sobriety and that it was unnecessary for her visitation to be supervised as long as she remained committed.

Sarah's therapist from the residential treatment program testified that she believed Sarah had participated honestly in her treatment and took responsibility for her

actions. She agreed with the program's discharge notes that Sarah was "capable of caring for her children" as long as she engaged in a "recovery lifestyle." Sarah's current therapist testified that Sarah was attending weekly appointments, and as long as she remained sober there was nothing that "would preclude her [from] effectively parenting her children." The therapist testified that Sarah was committed to her children and her recovery.

## 2. The custody modification order

The court issued an oral ruling. The court found that Sarah's relapse, and particularly the September incident, demonstrated a substantial change of circumstances.[2] The court then discussed each of the statutory best interests factors.[3] It first found that

---

[2] Sarah does not challenge this finding on appeal.

[3] When "determining the best interests of the child" in the course of a custody proceeding, "the court shall consider"

> (1) the physical, emotional, mental, religious, and social needs of the child;
>
> (2) the capability and desire of each parent to meet these needs;
>
> (3) the child's preference if the child is of sufficient age and capacity to form a preference;
>
> (4) the love and affection existing between the child and each parent;
>
> (5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;
>
> (6) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child . . . ;

(continued...)

the children had needs typical of children their age, and that the first factor did not favor either parent. Turning to the second factor — the capability and desire of each parent to meet the children's needs — the court concluded that although "[t]he conflict in this case [was] driven by both of the parents," Sarah was currently "not capable of meeting her children's emotional and mental needs" because she had "prioritized her own needs" and focused on her conflict with Edward. The court noted that neither party had presented evidence about the third factor, the children's preferences, and that at age 11 the older child would likely prefer to have time with both parents. Considering the fourth factor, the court found there was clearly love and affection between the children and both parents.

The court discussed at length the fifth factor, which considers the importance of a stable and satisfactory living environment. The court determined that the 50/50 custody arrangement "ha[d] not been a particularly stable or satisfactory environment, given the level of conflict in this case and the fact that the parents [were] bringing their children into the conflict." The court found that Sarah and Edward both participated in the other's phone calls with the children and sometimes used the occasion

---

[3]     (...continued)
(7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;

(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;

(9) other factors that the court considers pertinent.

AS 25.24.150(c)(1)-(9).

to engage in name-calling and other "disrespectful communications," upsetting the children.

As for the sixth factor — the willingness and ability of each parent to facilitate and encourage a close relationship between the children and the other parent — the court found that "[b]oth parents have room for improvement on this factor in terms of truly appreciating the importance of each other's roles in their children's lives and acting in a way that will continue to encourage a close and continuing relationship between the children and each of their parents." The court ordered both Edward and Sarah to complete at least six sessions with a parenting coach and to give the children privacy in their phone calls with the other parent.

Although the court found the September incident to be "extremely alarming," it did not find that the incident amounted to domestic violence under the seventh factor. The court noted that the event "included threats and even physical altercation between the parties" and that it resulted from Sarah's decision to leave the children home alone, "returning after having been drinking and then in such a state that the children called [Edward]." The court found that Edward acted as the safe parent throughout the incident. The court said, "This incident clearly impacted the children, their emotional and mental well-being, and yet they were questioning their decision to call their father to respond and are blaming themselves for this incident." Finally, for the eighth factor, the court found that Sarah's "history of alcohol abuse is directly affecting the emotional well-being of the children."

The court concluded that neither parent was properly "focusing on [their] children" but that Sarah was incapable of meeting the children's emotional and mental needs because of her struggle with alcohol abuse, and the best interests factors therefore favored Edward. The court ordered the parents to continue sharing legal custody, but it

awarded Edward primary physical custody with limited, unsupervised visitation for Sarah.

The court's written order incorporated its oral ruling. The court ordered Sarah to remain sober, continue regular alcohol testing, and obtain a new substance abuse assessment. For the next six months she was required to complete alcohol screening tests three times a day, then weekly urinalysis tests until September 2020. Other provisions bound both parents: they were required to communicate only about the children and only through the OurFamilyWizard computer program; to refrain from making disparaging comments about each other; to complete at least six sessions with a parenting coach; and to give the children privacy during their phone conversations with the other parent.

The order also established a visitation schedule. Provided Sarah remained sober, she would have unsupervised visitation on Wednesdays after school and every Saturday from 10:00 a.m. to 5:00 p.m. She was encouraged to attend the children's extracurricular and school events. After three months of demonstrated sobriety, her visitation would increase to include one weekend night per week, and after six months of sobriety it would increase again to two weekend nights per week. The court denied Sarah's requests for "the children to spend spring break, a two-week vacation, and half of summer break" with her.

Sarah moved for reconsideration, arguing that the court erred by limiting her visitation and by not laying out "a path to resuming shared custody." The court denied the motion, though it observed that "[i]f either party believes that there has [been] a substantial change in circumstances and that modification is in the children's best interests, either party is free to file a motion to modify." Sarah appeals; Edward is not participating.

## III. STANDARD OF REVIEW

"Trial courts have broad discretion in determining whether a proposed child-custody modification is in the child's best interests. We will set aside the superior court's best interests determination only if the trial court abused its discretion or if the fact findings on which the determination is based are clearly erroneous."[4] Clearly erroneous findings are those that leave us with "a definite and firm conviction that the trial court has made a mistake"; and we will find an abuse of discretion if the trial court "considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others."[5] We review visitation decisions for an abuse of discretion.[6]

## IV. DISCUSSION

### A. The Superior Court Did Not Clearly Err Or Abuse Its Discretion In Awarding Primary Physical Custody To Edward.

The court's decision to modify an existing custody order "must be guided by the best interests factors listed in AS 25.24.150(c)."[7] Sarah argues that the court improperly weighed some factors while ignoring others and that its findings of fact are not supported by the record. We conclude that the court's findings are not clearly erroneous and that it did not abuse its discretion in assigning them weight.

---

[4] *Bruce H. v. Jennifer L.*, 407 P.3d 432, 436 (Alaska 2017) (quoting *Rego v. Rego*, 259 P.3d 447, 452 (Alaska 2011)).

[5] *Joy B. v. Everett B.*, 451 P.3d 365, 368 (Alaska 2019) (quoting *Hamilton v. Hamilton*, 42 P.3d 1107, 1111 (Alaska 2002)).

[6] *John E. v. Andrea E.*, 445 P.3d 649, 658 (Alaska 2019).

[7] *Georgette S.B. v. Scott B.*, 433 P.3d 1165, 1171 (Alaska 2018) (quoting *Judd v. Burns*, 397 P.3d 331, 339 (Alaska 2017)); AS 25.24.150(c)(1)-(9).

Sarah first argues that the court erred in determining that factor two — "the capability and desire of each parent" to meet the child's needs[8] — favored Edward and that it gave this factor too much weight. She notes the court's finding that neither parent was properly focused on the children and contends that there was no evidence that her alcohol use made her less capable than Edward of meeting the children's needs.

It is true that the court faulted both parents for their failure to prioritize their children. But the evidence clearly supports the court's finding that Sarah had more work to do in establishing and maintaining her sobriety before she would be able to meet the children's needs. The court's description of the September altercation concluded with the findings that Sarah "was in no position to be a safe parent at that time or to make any kind of rational decisions for the children as a parent" and that even after six weeks of sobriety, by continuing to insist that she had been capable of parenting that night, she showed "a lack of insight [into] the danger to the children of being with an adult who is unable to exercise their parental duties." Sarah's therapists testified that she could safely parent as long as she remained sober. The court specifically considered Sarah's history of alcohol abuse when evaluating her ability to meet the children's needs, concluding that she had to demonstrate a longer period of sobriety before it would be "in the best interests of the children to return to a 50/50, week-on/week-off schedule." We see no clear error in the court's findings related to factor two or in its determination that the factor favored Edward.

Next, Sarah argues that the court erred in its analysis of factor five — "the length of time the child has lived in a stable, satisfactory environment and the desirability

---

[8]     AS 25.24.150(c)(2).

of maintaining continuity"[9] — because it did not consider the instability that would result from a drastic reduction in Sarah's time with the children. But the court did not clearly err in finding that the 50/50 custody arrangement "ha[d] not been a particularly stable or satisfactory environment" because of the parents' constant conflicts — often in the children's presence — including name-calling and other "disrespectful communications." It is true that the custody modification greatly reduced the amount of time the children have with Sarah, but factor five does not require the court to maintain what it has found to be an unstable and unsatisfactory environment solely for the sake of continuity.

Factor eight — "evidence that substance abuse . . . directly affects the emotional or physical well-being of the child"[10] — was the court's central concern. Sarah argues that the court placed too much weight on the impact of her alcohol abuse, and that the court's findings on the subject were clearly erroneous. She argues that the court downplayed Edward's role in the September incident by ignoring his threat to call the police and his failure to take any responsibility for escalating the situation. She also argues that the court implicitly found — or at least should have found — that it was the parents' conflict, not her alcohol use, that was harmful to the children.

But the court found that Sarah's "history of alcohol abuse [was] directly affecting the emotional well-being of the children." The court noted that the September incident, even though it did not amount to domestic violence, included threats and a physical altercation and that it arose from Sarah's decision to go have drinks with a friend while leaving the children alone. The court found that Sarah was "under the influence" when she came home. It found that the incident "clearly impacted the

---

[9]     AS 25.24.150(c)(5).

[10]     AS 25.24.150(c)(8).

children, their emotional and mental well-being," because they were "placed in a situation where they [were] being exposed to an extremely high level of conflict."

The court's findings about the September incident reflect what can be seen on the video and are not clearly erroneous. The incident was plainly disturbing for the children, and, as Sarah admitted during the hearing, both parents missed opportunities to de-escalate the situation. Although Sarah took responsibility for the incident, even at the hearing two months later she believed she could have safely parented the children that night if Edward had left them alone. The court was concerned about this belief and concluded that it demonstrated a continuing "lack of insight" into the risks her behavior posed to the children.

"While the 'court cannot assign disproportionate weight to particular factors while ignoring others, it has considerable discretion in determining the importance of each statutory factor in the context of a specific case and is not required to weigh the factors equally.' "[11] Here, the superior court reached a reasoned decision based on factual findings that are not clearly erroneous. We conclude that the court did not abuse its discretion in concluding that an award of primary physical custody to Edward was in the children's best interests.

**B.     The Superior Court Did Not Abuse Its Discretion By Limiting Sarah's Visitation And Failing To Establish A Specific Plan For Her To Regain 50/50 Physical Custody.**

Sarah argues that the superior court abused its discretion by not giving her more visitation time and by failing to make specific findings to justify the limited visitation schedule. Also, analogizing to supervised visitation cases, Sarah asserts that the superior court abused its discretion by not laying out a plan by which she could

---

[11]     *Georgette S.B.*, 433 P.3d at 1171 (quoting *Judd*, 397 P.3d at 339-40).

regain the original 50/50 custody arrangement. We conclude that the superior court did not abuse its discretion in either regard.

"[T]he trial court must make specific findings supporting a limited award of visitation unless the reasons can be gleaned from the record."[12] Sarah argues that although her alcohol abuse can be gleaned from the record, that finding alone does not support such a drastic reduction in visitation as is at issue here: from 50/50 custody to two daytime periods a week, with only gradual increases as benchmarks are met. Sarah points to *I.J.D. v. D.R.D.*, in which a mother was awarded three overnight visits per month plus holidays, and we vacated and remanded for the superior court to "make specific findings explaining the award of visitation" because we were "unable to discern why the trial court awarded such restricted visitation."[13] In *Bruce H. v. Jennifer L.* we concluded that an order reducing visitation from "three nights per week for at least two years prior to trial" to "only one 30-minute phone or video call per week, two weeks of summer visitation, and alternating Christmas and spring break vacations" did not include findings that supported such restricted visitation.[14] And recently we remanded an order that reinstated limited unsupervised visitation for the father after he had had several months of full physical custody, observing that "[w]ithout an explanation of [the superior court's] reasoning" we were unable to review the decision for an abuse of discretion.[15]

In this case, however, the superior court made findings in support of its visitation decision that are sufficient for appellate review. The court discussed at length Sarah's history of alcohol abuse, her return to social drinking, the September incident

---

[12] *I.J.D. v. D.R.D.*, 961 P.2d 425, 432 (Alaska 1998).

[13] *Id.*

[14] 407 P.3d 432, 441-42 (Alaska 2017).

[15] *John E. v. Andrea E.*, 445 P.3d 649, 658-59 (Alaska 2019).

that prompted Edward's modification motion, and the effect of these issues on the children. The court specifically recognized that increased visitation would be appropriate as Sarah remained committed to her sobriety over time, and it tied increased visitation to Sarah's success in meeting specific benchmarks. We see no abuse of discretion in the superior court's visitation award.

Sarah also asks us to apply the benchmark framework that we have developed in the context of supervised visitation, where we require the trial court to specify the pathway by which a parent can move to unsupervised visitation. Sarah argues that the limits on her visitation are just as severe as a supervision requirement. She points out that the court could have explicitly said that her one-year sobriety date (in September 2020) would be a substantial change of circumstances prompting a reevaluation of the custody order, but as is she will have to file a motion to modify custody and demonstrate that there has been a substantial change in circumstances justifying modification.[16]

It is true that in supervised visitation cases "we prefer a 'plan by which unsupervised visitation can be achieved,' "[17] but we have never required that there be a plan for moving from visitation to 50/50 custody. We note, however, that the court in this case appeared to anticipate such a transition, in effect inviting a modification motion

---

[16]     The trial court docket shows that Sarah did in fact file a motion to modify custody in September 2020, and the motion is set for hearing beginning in February 2021. We note also that Sarah may seek to modify visitation even if she cannot meet the "substantial change of circumstances" standard necessary to justify a modification of custody; "a lesser showing is required for a 'change in circumstances' determination when a parent seeks to modify visitation rather than custody." *Collier v. Harris*, 261 P.3d 397, 408 (Alaska 2011).

[17]     *Rodvik v. Rodvik*, 151 P.3d 338, 345 (Alaska 2006) (quoting *Fardig v. Fardig*, 56 P.3d 9, 14-15 (Alaska 2002)).

once Sarah achieved a year of sobriety. We have held that positive lifestyle changes can constitute a substantial change in circumstances justifying a modification of custody. For example, in *Evans v. McTaggert*[18] we concluded that a "non-custodial parent can satisfy the threshold substantial change of circumstances requirement by demonstrating a positive change in his or her personal circumstances." In *Evans* "the mother's ability to demonstrate that she had matured, held a job for an extended period of time, and controlled her former drinking problem amounted to a substantial change in circumstances."[19]

We conclude that the court acted within its discretion in awarding limited, unsupervised visitation while anticipating further requests to modify custody as Sarah's recovery continues.

## V.    CONCLUSION

We AFFIRM the superior court's custody modification and visitation order.

---

[18]    88 P.3d 1078, 1097 (Alaska 2004).

[19]    *Id.*