*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ADAM F., | ) | |
| | ) | Supreme Court No. S-18519 |
| Appellant, | ) | |
| | ) | Superior Court No. 1SI-20-00108 CI |
| v. | ) | |
| | ) | O P I N I O N |
| CAITLIN B., | ) | |
| | ) | No. 7705 – July 12, 2024 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Sitka, M. Jude Pate, Judge.

Appearances: Taylor R. Thompson, Thompson Law Group, Anchorage, for Appellant. James W. McGowan, Sitka, for Appellee.

Before: Maassen, Chief Justice, and Borghesan and Henderson, Justices. [Carney and Pate, Justices, not participating.]

HENDERSON, Justice.

I. INTRODUCTION

A mother sought to modify visitation between her child and the child's father based upon allegations of domestic violence between the father and his new romantic partner. On the day of the court hearing about the mother's request, the father's attorney withdrew from the case, and a different attorney took over representing the father. The court allowed the substitution of counsel, but denied the father's request

for a continuance to give his new attorney additional time to prepare. The court proceeded with the hearing, which continued into a second day six days later. At the conclusion of the hearing, the court found that the father had committed five acts of domestic violence: two that constituted assault or reckless endangerment and three violations of domestic violence protective orders. It also found that the father was not engaged in a previously ordered domestic violence intervention program. Initially the court declined to modify the father's visitation, but two days later it reconsidered its order and temporarily suspended the father's visitation pending his demonstration of engagement with a domestic violence intervention program.

The father appeals the court's denial of his request for a continuance, its findings of domestic violence, and its temporary suspension of his visitation. Observing no clear error or abuse of discretion, we affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. Divorce and long-term domestic violence protective orders

Caitlin B. and Adam F. were married in 2016 and had one child together in 2017. In September 2020, Caitlin filed for divorce and was granted long-term domestic violence protective orders (DVPOs) against Adam, on behalf of both herself and the child. Among other terms the DVPOs denied Adam visitation with the child.[1] A couple of months later Adam hired an attorney to represent him in the divorce and custody proceeding.

In July 2021 the superior court issued a divorce decree and custody and visitation order deciding all contested issues. The court found that both parties had "a history of domestic violence" that triggered the rebuttable presumption against custody and unsupervised visitation,[2] but it found that Caitlin was less likely to perpetuate

---

[1] The order was extended in October 2021 for an additional year.

[2] AS 25.24.150(g).

domestic violence and awarded her sole legal and primary physical custody of the child. In a separate order the court awarded Adam supervised visitation for two hours, twice a week, noting Adam had begun, but not completed, a domestic violence intervention program (DVIP) that would rebut the presumption against custody and unsupervised visitation.[3]  The court also modified the DVPOs that had been previously issued to allow for supervised visitation, but ordered that Adam could not be "within sight or sound" of Caitlin during custody exchanges.[4]

### 2.    Caitlin's motion to modify visitation

In December 2021 Caitlin filed a request to suspend Adam's visitation with the child, asserting a change in circumstances because he had disengaged from his DVIP program and committed a new act of domestic violence against his romantic partner Mackenzie.  Several months later additional acts of domestic violence came to light when Mackenzie filed for a DVPO against Adam.  Adam's attorney was not able to represent him in the context of the DVPO litigation because the attorney had represented Mackenzie in a previous unrelated criminal matter, so Adam secured a different attorney to represent him in the DVPO case.  Meanwhile, the hearing on Caitlin's motion to modify visitation was delayed in part by Adam's noncompliance with discovery, and the hearing was eventually scheduled for August 2022.  Adam moved to modify the DVPO held by the child so that he could wave to her if he was driving past her, and this motion was scheduled to be considered along with Caitlin's during the parties' upcoming hearing.  In the meantime, Adam continued to have supervised visitation.

---

[3]      AS 25.24.150(h).

[4]      Between the time of the original custody order and the custody modification hearing at issue Caitlin asserted violations of the DVPO that resulted in a separate temporary suspension of Adam's supervised visitation not subject to this appeal.

### B. Proceedings

#### 1. Denying Adam's requested continuance

On the day of the parties' hearing, Adam's attorney moved to withdraw from the case. The attorney cited an unwaivable conflict in light of the fact that Mackenzie, also her current client, had been subpoenaed to testify in the custody hearing.[5] In spite of the fact Caitlin's visitation motion was based largely upon violence between Adam and Mackenzie, the attorney stated that she had not been certain an unwaivable conflict existed until Mackenzie was actually subpoenaed to testify in the visitation-related proceedings.[6] The attorney did not explain why she did not seek to withdraw at that time. Adam sought to have the attorney who had represented him in his DVPO case against Mackenzie step in to represent him in this visitation litigation as well. That attorney was present at the hearing and willing to take over the representation.

Caitlin disagreed with the assertion that a conflict existed, and contended that Adam's motion "appear[ed] to be a manipulative effort to avoid" that day's hearing. After hearing evidence on the nature of the conflict the court agreed that the attorney seeking to withdraw appeared to have a conflict that "fit within 1.7(a)(2),"[7] but expressed dismay over the attorney's failure to identify and act on the conflict in a timely way. The court permitted the withdrawal and substitution of new counsel, who was present.

---

[5]     Alaska R. Prof. Conduct 1.7(a)(2); ABA Comm. on Ethics & Pro. Resp., Formal Op. 367 (1992).

[6]     Under certain circumstances, an attorney's client can agree to waive conflicts of interest. Alaska R. Prof. Conduct 1.7(b).

[7]     Alaska Professional Conduct Rule 1.7(a)(2) states that a conflict of interest exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer."

Adam's new attorney immediately sought a continuance. She stated, "[T]here's no way I could be ready to go today" and asserted that conducting the hearing that same day would not allow her to "zealously advocate" for Adam. Caitlin objected to any continuance. She noted that Adam's discovery-related conduct had already delayed the hearing, that he had long been on notice of the conflict that caused his first attorney to withdraw, and that the new attorney should be prepared to litigate about allegations of domestic violence between Adam and Mackenzie because she had represented Adam in the related DVPO proceeding.

The court granted a continuance with respect to litigation over discovery and child support issues, of which Adam's new attorney lacked knowledge, but denied the request to continue litigation about the allegations of domestic violence between Adam and Mackenzie and whether a change in visitation or modification of the child's DVPO would be in the child's best interests. The court cited previous delay in the case and also reasoned that Adam's new attorney had represented him in related DVPO proceedings and that she should be "ready to go forward on those issues." The court observed that the two grounds for Caitlin's motion to modify visitation were: (1) Adam's alleged "new acts of domestic violence," and (2) his alleged failure to remain engaged in a DVIP program. The court decided both were time-sensitive.

### 2.     The August 11 and continued August 17 trial days

The evidentiary hearing then began with Caitlin putting on her case, including calling Adam and Mackenzie as witnesses. The court routinely paused the hearing to permit Adam's counsel to attend other scheduled hearings "to be sensitive, . . . to [the] degree [it] can, to [Adam]'s ability to have an attorney." Ultimately the parties and the court ran out of time at the end of the court day and had to schedule a second hearing, six days later.

At the continued hearing on August 17, Adam completed his cross-examination of Mackenzie, put on his witnesses, and also testified. During closing

argument, Adam nonetheless asserted that he had not had the "opportunity to . . . prepare" his case. [8]

During the two hearing days, the court heard testimony about Adam's physical altercations with Mackenzie, as well as about Adam's violations of the protective orders held by Caitlin and the parties' child. Regarding the physical altercations, Mackenzie testified about an incident earlier that summer in which she had returned to her father's home late one night after she and Adam had argued. She said Adam came to the home and somehow got into the locked house. Mackenzie testified that she quietly told Adam to leave and that he refused, speaking loudly enough that she believed her brother in the next room could hear him "wanting [Mackenzie] to go back home with him." She testified that Adam then "picked [her] up from the chair" she was sitting in, and she fell on the ground "because . . . [she] was wiggling around . . . trying to get out." After Mackenzie hit the ground, she said Adam held her down. Mackenzie testified that Adam then picked her up again, this time aggressively, and threw her down on her upper back. After he stopped, she said she felt unwell and checked for bruising and saw none. She also said that "when [she] did fall on [her] upper back, it was not like intentional. It's how [she] wiggled out and how [she] just landed."

Mackenzie also testified about a second recent incident during which Adam entered her father's home without permission, this time while she was preparing for her second day of work at a new job. Mackenzie indicated that Adam was there because he wanted her to work at his shop instead of her new job, and that she did not want to talk to him. She said he became frustrated and eventually became loud enough

---

[8] During closing arguments, Adam requested the opportunity to call his therapist, who had been present on the August 11 trial day, to testify about the type of work she had done with him. Adam had not previously called the therapist as a witness, and the court did not reopen the evidence. Regardless, Adam does not argue on appeal that the court's decision to move forward with the August 11 trial day prejudiced his ability to call the therapist.

"where people possibly could hear outside," so she told him to stop and leave. Mackenzie testified that Adam then lifted her from behind by the waist while she was "crouched down on the ground . . . getting ready for work," and threw her on her bed, an act that both startled and shocked her. She said that she was not hurt, but was more concerned for her younger brother, who was in the house. She explained that although she did not think Adam would do anything else in that moment, she was "frightened. . . because . . . it's just you . . . don't really know what's going to happen next."

Adam's testimony differed greatly from Mackenzie's. Regarding the first incident, he stated that he went to Mackenzie's father's home to check on her after she had not responded to his calls. He stated he did not remember if Mackenzie's father asked him to leave his house or if he asked Mackenzie to leave with him. He denied grabbing Mackenzie and lifting her off the ground that night, and said he had only previously done so in a playful, non-controlling way. Regarding the second incident, Adam testified he entered the home through an unlocked door and calmly spoke to Mackenzie since he had not heard from her for several days. He claimed that Mackenzie yelled at him, and that he did not pick her up or throw her down at any point.

### 3. The superior court's findings and related decisions

At the conclusion of the hearing, the court made findings and a decision on the record regarding Caitlin's motion to modify visitation and Adam's motion to modify the DVPO held by the child. Significant to this appeal the court found Adam had committed five acts of domestic violence since its last custody- and visitation-related order. The court found three violations of protective orders and two incidents of "assault in the fourth degree and/or reckless endangerment" against Mackenzie.[9] The

---

[9] AS 11.41.230 (assault in the fourth degree); AS 11.41.250 (reckless endangerment). Crimes against a person under AS 11.41, which include assault in the

court relied on Mackenzie's testimony to support its findings. It found Mackenzie credible and stated its impression that she testified truthfully but tried to shade her testimony in favor of Adam. The court found that Adam was not credible. At that time the court concluded that it had not "heard the level of evidence [it] would need to preclude [Adam]'s visitation entirely," as Caitlin's motion had sought. It noted the lack of direct evidence that anything inappropriate had happened during Adam's supervised visitation. The court determined that it was a close call, but that it did not find extraordinary circumstances sufficient to suspend his visitation entirely. It ruled that Mackenzie should not be present for Adam's supervised visits with the parties' child, given its concern about exposing the child to domestic violence and the dynamic between Adam and Mackenzie. It also reiterated that Adam needed to meaningfully engage with and complete a DVIP program in order to pursue unsupervised visitation. Finally, the court granted Adam's request to modify the child's protective order so that he could wave at the parties' child if driving past her on the road where Adam lived.

The next day the court notified the parties that it was reconsidering its order on its own motion pursuant to Alaska Civil Rule 77(k)(5).[10] The court held a hearing on August 19 to explain the reasons for its reconsideration and resulting decision on the record. During that hearing it revised its findings and determined that it was in the child's best interests to temporarily suspend all visitation with Adam. The

---

fourth degree and reckless endangerment, are acts of domestic violence when the perpetrator and victim have engaged in a dating or sexual relationship. AS 18.66.990(3)(A), (5)(C), (5)(D). Adam did not appeal the court's findings of three violations of a protective order that also each constitute an act of domestic violence. AS 18.66.990(3)(G). An act of "domestic violence is a substantial change in circumstances" for purposes of a motion to modify visitation as a matter of law. *Bruce H. v. Jennifer L.*, 407 P.3d 432, 436 (Alaska 2017) (citing AS 25.20.110(c)).

[10]     Alaska R. Civ. P. 77(k)(5) ("The court, on its own motion, may reconsider a ruling at any time not later than 10 days from the date of notice of the final judgment in the case.").

court noted that it did not make the decision lightly as this was "the most serious decision" it could make. The court stated it had given "too much weight to [Adam]'s parental rights" in its earlier decision and that it had "failed to give enough weight to what is in [the child's] best interest." It observed that Adam showed "a blatant disregard for court orders" by "violat[ing] protective orders three times." It also observed that the nature of the acts of domestic violence he committed against Mackenzie were similar to those he had committed in the past against Caitlin. The court reiterated its concern that Mackenzie's presence during Adam's supervised visitation with the child would allow for "those echoes and that relation of domestic violence to seep into [the child]." Finally, it determined Adam was not "enrolled" in a DVIP program as the court had previously required when it awarded him supervised visitation. Given these considerations the court concluded that extraordinary circumstances indeed existed necessitating "a temporary suspension of [Adam]'s [supervised] visitation."

After imposing the temporary suspension, the court outlined the steps Adam needed to take in order to petition to resume both supervised and then unsupervised visitation. In addition to refraining from further acts of domestic violence, the court explained that he needed to attend an intake meeting with a particular service provider available in Southeast Alaska. He also needed to complete a psychological evaluation administered by a licensed practitioner. The court expressly noted that Adam "d[id] not need to wait for recommendations" from the Southeast provider or complete the recommended DVIP courses to apply for supervised visitation. It explained that in order to petition for unsupervised visitation, however, he needed to complete the recommended DVIP courses. In addition the court revoked the modification of the protective order that had allowed Adam to wave at the child. The court outlined its new findings and decision in a written order.

Adam now appeals the court's denial of his request for a continuance, its findings that he committed acts of domestic violence against Mackenzie, and its order temporarily suspending his supervised visitation with the child.

## III. STANDARD OF REVIEW

"We 'will not disturb a [superior] court's refusal to grant a continuance unless an abuse of discretion is demonstrated.' "[11] "An abuse of discretion exists when a party has been deprived of a substantial right or seriously prejudiced by the [superior] court's ruling."[12] "We consider 'the particular facts and circumstances of each individual case to determine whether the denial was so unreasonable or so prejudicial as to amount to an abuse of discretion.' "[13]

Whether "findings on domestic violence are supported by the record is a question of fact which we review for clear error."[14] "Whether the superior court applied the correct legal standard is a question of law that we review de novo."[15]

"The superior court has broad discretion in determining 'whether, following an evidentiary hearing, the moving party has proven a substantial change in circumstances, meaning one that affects the child's welfare.' "[16] We also review a court's decision on whether a proposed modification in visitation is in the child's best interests for abuse of discretion.[17] "We will set aside the superior court's best interests determination only if the trial court abused its discretion or if the fact findings on which the determination is based are clearly erroneous."[18] "A factual finding is [clearly]

---

[11]     *Layton v. O'Dea*, 515 P.3d 92, 100 (Alaska 2022) (alterations in original) (quoting *Greenway v. Heathcott*, 294 P.3d 1056, 1062 (Alaska 2013)).

[12]     *Id.* (alterations in original) (quoting *Greenway*, 294 P.3d at 1062).

[13]     *Id.* (quoting *Greenway*, 294 P.3d at 1062).

[14]     *Bruce H.*, 407 P.3d at 436 (quoting *Caroline J. v. Theodore J.*, 354 P.3d 1085, 1090 (Alaska 2015)).

[15]     *Id.* (quoting *Rego v. Rego*, 259 P.3d 447, 452 (Alaska 2011)).

[16]     *Id.* (quoting *Collier v. Harris*, 377 P.3d 15, 20 (Alaska 2016)).

[17]     *Id.* (citing *Skinner v. Hagberg*, 183 P.3d 486, 489 (Alaska 2008)).

[18]     *Id.* (quoting *Rego*, 259 P.3d at 452).

erroneous if, 'based on a review of the entire record, the finding leaves us with a definite and firm conviction that a mistake has been made.' "[19]

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion When It Partially Denied A Continuance After A Substitution Of Counsel.

Adam asserts the superior court abused its discretion when it denied him a continuance after his former attorney had to withdraw from representing him.[20] He asserts that he was diligent in finding a new attorney and that, though his former attorney may have failed to timely address her conflict of interest, it would be unfair to impute that lack of diligence to him. He argues that he was unprepared for the hearing and, as a result, lost his ability to visit with the parties' child.

Caitlin contends that Adam has failed to demonstrate he was diligent in obtaining new counsel and, regardless, has failed to explain how the court's denial of a continuance prejudiced him.

"A party is not automatically entitled to a continuance when counsel withdraws, especially if the party is not free from fault or does not use due diligence to obtain substitute counsel."[21] To establish that the court's denial of a continuance in this context amounted to an abuse of discretion, the moving party must first demonstrate that the party acted with due diligence to find and obtain counsel.[22] If the party was diligent in obtaining counsel, then the party must demonstrate either: (1) denial of the

---

[19]   *Id.* (quoting *Rego*, 259 P.3d at 452).

[20]   Adam characterizes the denial of the continuance as covering all matters to be decided at the hearing, but the court granted a partial continuance on issues unrelated to the best interests of the child.

[21]   *Taylor v. Gill St. Invs.*, 743 P.2d 345, 349 (Alaska 1987).

[22]   *Layton v. O'Dea*, 515 P.3d 92, 101-02 (Alaska 2022) (citing *Greenway v. Heathcott*, 294 P.3d 1056, 1067 (Alaska 2013)).

continuance prejudiced the party or deprived the party of a substantial right,[23] or (2) the court inappropriately weighed "the need[] for . . . promptness with [a party's] right to fair" representation in the particular case.[24]

Here, although it appears Adam's former counsel failed to promptly identify and address her conflict of interest, we need not determine whether lack of diligence by Adam's attorney should be imputed to him.[25] Even if Adam acted with due diligence in securing a new attorney, the superior court's denial of his requested continuance did not prejudice his substantial right to present his case or his ability to secure fair representation.

As a threshold matter, Adam makes no argument that he was not able to accomplish a specific action at trial due to the court's denial of a continuance. Nor does his appeal articulate, or even imply, what he would have, or thinks he would have, accomplished had he received a continuance. When asked during oral argument what Adam would or could have done differently had the superior court granted his request for a continuance, he had no substantive answer. He only generally asserted he would have been better able to prepare his own testimony.

Equally unpersuasive is Adam's related argument that moving immediately forward with his new attorney was tantamount to having to represent himself during the hearing. Adam likens his circumstance to that of the father in *Fidler v. Fidler*, where we held the denial of a self-represented father's requested continuance was an abuse of discretion.[26] But Adam was not self-represented and the record

---

**23**     *Fidler v. Fidler*, 296 P.3d 11, 13 (Alaska 2013).

**24**     *Sarah D. v. John D.*, 352 P.3d 419, 427 (Alaska 2015) (third alteration added) (quoting *Sylvester v. Sylvester*, 723 P.2d 1253, 1256 (Alaska 1986)).

**25**     *See* Alaska R. Prof. Conduct 1.7(c) (requiring attorneys "act with reasonable diligence in determining whether a conflict of interest . . . exists").

**26**     296 P.3d at 12-13.

establishes that his attorney was able to substantively assist him with the issues taken up at the hearing. Indeed, Adam concedes on appeal that "his [current] attorney did an amazing job all things considered."

The palpable distinction between Adam and the father in *Fidler* is that Adam was significantly assisted by his counsel throughout the proceeding at issue.[27] Adam, through his attorney, was able to raise multiple objections to Caitlin's questions, respond to objections, request that he be presented exhibits when testifying about them, take notes, be guided through his testimony, and exclude admission of one of Caitlin's proposed exhibits. Again, Adam has failed to identify any meaningful way in which the court's initial denial of a continuance impacted what he hoped to accomplish during the hearing. This is in stark contrast to the self-represented father in *Fidler*, who was unable to offer certain evidence and could not raise certain arguments, due to the court's denial of a continuance.[28]

Furthermore, the court eventually did need to continue the hearing into a second day. And when the superior court inquired about a next hearing date, Adam and his counsel announced that they could be available and ready for a continued hearing on August 17. If Adam was caught flat-footed by the withdrawal of his former attorney on the first day of the hearing, the court's scheduling of a continued hearing six days later in this context cured any associated prejudice. Given that Adam was able to present the case he wanted to, with his attorney present, we conclude that he was not prejudiced by the court's denial of a continuance of the first hearing day.[29]

We also reject Adam's related argument that the court improperly balanced his right to representation with the need to resolve new domestic violence

---

[27]   *See id.* at 13.

[28]   *See id.*

[29]   This case is also distinguishable from *Fidler* in that Adam had seven months of notice about the nature of the hearing whereas Fidler had none. *Id.* at 12-13.

allegations and their impact on his visitation. We consider the particular circumstances of each "case to determine whether the denial [of a continuance] was so unreasonable" as to constitute an abuse of discretion.[30] Alaska "courts should balance the need[] for . . . promptness with the right[] to fair presentation of the case."[31] " 'Because of the necessity for orderly, prompt[,] and effective disposition of litigation and the loss and hardship to the parties and witnesses [when litigation is delayed],' a motion for continuance should be denied absent a 'weighty reason to the contrary.' "[32] Here, particularly where Adam's new counsel was already familiar with the allegations of domestic violence central to the hearing, and had already prepared to litigate those allegations in a separate matter, the court did not abuse its discretion in prioritizing the need to move ahead with the hearing. Moreover, the hearing was meant to address a time-sensitive issue — whether Adam had committed acts of domestic violence warranting a change in visitation — and the hearing had already been significantly delayed. The superior court's balancing of Adam's interest in fair representation with the need to move forward promptly with the hearing was well within its discretion.

## B. The Superior Court Did Not Clearly Err In Finding That Adam Committed Acts Of Domestic Violence.

Adam claims that the superior court clearly erred when it found he committed two acts of assault or reckless endangerment against Mackenzie. He broadly argues that the court lacked evidence that he acted recklessly, that he injured Mackenzie, and that he intended to injure Mackenzie. Caitlin, meanwhile, contends

---

[30]     *Layton v. O'Dea*, 515 P.3d 92, 100 (Alaska 2022) (quoting *Greenway v. Healthcott*, 294 P.3d 1056, 1062 (Alaska 2013)).

[31]     *Sarah D. v. John D.*, 352 P.3d 419, 427 (Alaska 2015) (alterations in original) (internal quotation marks omitted) (quoting *Sylvester v. Sylvester*, 723 P.2d 1253, 1256 (Alaska 1986)).

[32]     *Id.* (first alteration in original) (quoting *Wagner v. Wagner*, 299 P.3d 170, 175 (Alaska 2013)).

that Adam mischaracterizes the evidence related to domestic violence, and she correctly observes that intent to injure is not a necessary element of assault or reckless endangerment.

We reject Adam's arguments for the reasons cited by Caitlin. First, Adam asks us to review the evidence of his conduct toward Mackenzie in the light most favorable to him. At the very least, he asks that we disregard facts in the record and reweigh the evidence. "[W]e ordinarily will not reweigh evidence, especially oral testimony."[33] The court heard sufficient evidence to find that Adam both physically hurt Mackenzie[34] and engaged "in conduct which create[d] a substantial risk of serious physical injury" to Mackenzie.[35] Mackenzie's testimony that Adam was loud enough that she thought people outside could hear him, that she told him to leave, and that on both occasions he picked her up and threw or dropped her is sufficient evidence for the court to find Adam committed assault in the fourth degree or reckless endangerment.

Second, Adam contends that the superior court's findings of assault or reckless endangerment are undermined by his lack of intent to injure Mackenzie. He cites *Sarah D. v. John D.* where we held that the superior court must look to "the perpetrator's intent" to determine whether the person " 'attempted' to place the other person 'in fear of imminent physical injury.' "[36] But *Sarah D.* is inapplicable here because the superior court in this case did not rely on findings that Adam was attempting to commit a particular crime, which would require evidence and findings related to what

---

[33] *Rosemarie P. v. Kelly B.*, 504 P.3d 260, 266 (Alaska 2021).

[34] AS 11.41.230 (assault in the fourth degree).

[35] AS 11.41.250 (reckless endangerment).

[36] 352 P.3d at 434 (quoting *Parks v. Parks*, 214 P.3d 295, 300 (Alaska 2009); *Harris v. Governale*, 311 P.3d 1052, 1058 (Alaska 2013)).

Adam intended.[37]  Indeed, in making this argument, Adam ignores the plain language of the statutes defining assault and reckless endangerment.  Neither statute requires the finding that a person intended to physically harm another person or endanger them — only that a person acted recklessly.[38]  A person acts recklessly with respect to a risk where the person is "aware of and consciously disregards a substantial and unjustifiable risk" of harm, such that disregard of the risk is a "gross deviation" from the conduct of a "reasonable person . . . in the situation."[39]  The court did not need to find that Adam intended to injure Mackenzie.  It only needed to find that Adam was aware of the substantial and unjustifiable risk that lifting Mackenzie off the ground and throwing or dropping her could result in injury (or fear of injury), that he disregarded that risk, and that his disregard of that risk was unreasonable.  The court heard ample evidence to support such findings in light of Mackenzie's testimony.  The court applied the correct legal standards and did not clearly err in finding that Adam committed two acts of assault or reckless endangerment against Mackenzie.

### C.   The Superior Court Did Not Abuse Its Discretion When It Temporarily Suspended Adam's Visitation With The Child.

Adam argues that the superior court abused its discretion when it suspended Adam's supervised visitation.[40]  He contends that the evidence did not support a finding of extraordinary circumstances allowing for suspension of all

---

[37]   *Compare* AS 11.31.100 (attempt), *with* AS 11.41.230 (assault in the fourth degree), *and* AS 11.41.250 (reckless endangerment).

[38]   AS 11.41.230(a)(1) (assault in the fourth degree); AS 11.41.250 (reckless endangerment).

[39]   AS 11.81.900(a)(3).

[40]   In appealing the custody order Adam expresses a concern that he "now has a duty to actively ignore" the child "in the small town of Sitka."  While Adam did not appeal the court's denial of his motion to modify the child's protective order, we understand this is a hardship for Adam.  But custody orders must be based on the best interests of the child, not on the hardship to the parents.  AS 25.24.150(c).

visitation. Caitlin disagrees, urging that the evidence before the court warranted suspension of visitation. Although Adam's argument regarding extraordinary circumstances presents a close question, we conclude based on the record as a whole that the court did not abuse its discretion.

As a preliminary matter we reject Adam's one-sentence argument that the court improperly focused on one best-interests factor in its decision suspending visitation.[41] Adam does not explain what factors the court failed to consider, and his argument is belied by the record. The court expressly weighed multiple relevant factors, including Adam's inability to put the child's needs over his own "sense of entitlement,"[42] his recent commission of certain acts of domestic violence,[43] and the extent to which his acts of domestic violence against Mackenzie would "bleed over" to the child and impact his ability to meet the child's needs.[44] The record demonstrates that the court did not improperly focus on one factor to the exclusion of other relevant factors in determining the best interests of the child.

Turning to Adam's core argument, that the evidence does not demonstrate "extraordinary circumstances" sufficient to suspend all visitation, we observe that this argument presents us with a closer call. Adam contends that the superior court's suspension of his visitation is contrary to our holding in *Bruce H. v. Jennifer L.* that requires the court to "explain its decision" to award "restricted visitation" with "specific

---

[41]     *See Park v. Park*, 986 P.2d 205, 211 (Alaska 1999) (holding "the superior court's singular focus" on one parent's resistance to other parent's request for "visitation suggests that it attached overriding importance to that one factor" and did not consider all relevant factors).

[42]     AS 25.24.150(c)(2) (capability and desire of each parent to meet child's needs).

[43]     AS 25.24.150(c)(7) (parental acts of domestic violence).

[44]     AS 25.24.150(c)(1) (child's physical, emotional, and mental needs), (2) (capability and desire of each parent to meet child's needs).

findings."[45]  Adam argues that his previous supervised visits complied with the court's requirements, and that there "was no risk of future mental harm to [the child] in his very limited supervised visits."  He also cites our unpublished decision in *J.D. v. C.S.*[46] as an illustration of what he contends is the high threshold to establishing extraordinary circumstances necessary to suspend a parent's visitation.

In response Caitlin asserts that ample evidence in the record supports the court's finding of extraordinary circumstances.  She first points to evidence considered by the court in making its initial visitation order, when the court found that Adam's acts of domestic violence were "some of the worst emotional power and control that [it had] seen, just the pure rage of it and the degree and the consistency."  She cites the court's observation that it had listened to related recordings from the first custody trial and that the recordings "shook" the court.  She also cites the statutory rebuttable presumption that a parent who perpetuates domestic violence "may not be awarded . . . joint physical custody."[47]

We have held that visitation should not be wholly "taken away absent extraordinary circumstances."[48]  We require a superior court suspending visitation "to make findings supporting that decision 'unless the reasons can be gleaned from the record.' "[49]  Our precedent on this topic is limited as "[t]here are relatively few divorce-related cases in which a parent's visitation rights have been completely taken away or

---

[45]     407 P.3d 432, 441-42 (Alaska 2017).

[46]     No. S-9552, 2001 WL 34818209 (Alaska Feb. 28, 2001).

[47]     AS 25.24.150(g).

[48]     *Bruce H.*, 407 P.3d at 441 (quoting *William P. v. Taunya P.*, 258 P.3d 812, 818-19 (Alaska 2011)); *see also* 1 JEFF ATKINSON, MODERN CHILD CUSTODY PRACTICE § 5-11 (2d ed. 2024).

[49]     *Bruce H.*, 407 P.3d at 441 (quoting *I.J.D. v. D.R.D.*, 961 P.2d 425, 432 (Alaska 1998)).

suspended."[50] While uncommon in divorce and child custody cases, it is not uncommon for the superior court to contemplate whether suspension of visitation is in a child's best interests where a child is in the custody of the State, pursuant to a child in need of aid proceeding.[51] Given the multiple factors carefully considered by the court in reaching its finding of extraordinary circumstances, and given the court's provision of clear steps that Adam could take in order to restore his supervised visitation within a relatively short period, we conclude that the court did not abuse its discretion in this case.

First, we begin by highlighting that the court did not terminate Adam's visitation — it only ordered a temporary suspension. Equally important is the court's provision of clear, achievable milestones Adam was required to complete before he could resume visitation. The temporary nature of the suspension and clear milestones, which upon completion would remove the suspension, ensured the court protected Adam's parental rights while making its visitation-related decision based on the best interests of the child.[52]

---

[50] *See* 1 JEFF ATKINSON, MODERN CHILD CUSTODY PRACTICES § 5-11 (2d ed. 2024).

[51] *See, e.g.*, *Rock H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-18160, 2022 WL 2236187, at *1-3 (Alaska Jun. 22, 2022) (observing suspension of visitation by the Office of Children's Services after parent failed to attend five scheduled visits); *cf.* AS 47.10.113(a) ("Except as provided [under the divorce and child custody statute], a court shall hear a request to make, modify, or vacate an order for the custody of or visitation with a minor child in state custody under this chapter as part of the child-in-need-of-aid proceedings related to the child.").

[52] *See* AS 25.24.150(c); *S.J. v. L.T.*, 727 P.2d 789, 796 (Alaska 1986) ("[P]arents should not be deprived of the fundamental rights and duties inherent in the parent-child relationship except for grave and weighty reasons." (alteration in original) (internal quotation marks omitted) (quoting *In re Adoption of K.M.M.*, 611 P.2d 84, 87 (Alaska 1980))); *see also Meyer v. Nebraska*, 262 U.S. 390, 399-400 (1923) (recognizing fundamental right to have and raise a family).

Next, we observe that the legislature enacted a statutory framework to protect children from domestic violence perpetrated by their parents.[53] Unless rebutted by completion of a DVIP program pursuant to AS 25.24.150(h), AS 25.24.150(g) prevents a superior court from awarding either legal or physical custody to a parent "who has a history of perpetrating domestic violence against the other parent, a child, or a domestic living partner." Prior to the current controversy over visitation, the court had already found that Adam had a history of perpetrating domestic violence due to his severe and violent acts of power and control against Caitlin. As a result, the law presumed that awarding him any legal or physical custody would be contrary to the child's best interests.[54] In addition the statute provides that a court "shall allow only supervised visitation by that parent with the child, conditioned on that parent's *participating in* and successfully completing an intervention program for batterers, and a parenting education program, where reasonably available."[55] This part of the statute also applied to Adam.[56] The court's temporary suspension of Adam's visitation was based in part on its finding that, contrary to its prior orders, Adam was not meaningfully engaged in a DVIP program.[57] Adam does not contest this finding on appeal.

---

[53] AS 25.24.150(g)-(k); *Stephanie F. v. George C.*, 270 P.3d 737, 751 (Alaska 2012) ("The legislature underscored the important priority of protecting children from domestic violence when it adopted AS 25.24.150(g)-(h).").

[54] *See* AS 25.24.150(g).

[55] AS 25.24.150(j) (emphasis added).

[56] *State v. Fyfe*, 370 P.3d 1092, 1099 (Alaska 2016) (presuming that in statutes "no words or provisions are superfluous and that the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect" (quoting *Adamson v. Mun. of Anchorage*, 333 P.3d 5, 16 (Alaska 2014))).

[57] Adam has not asserted that a DVIP program is not available where he lives. As we have said before, where no certified DVIP program is available a suitable alternative will meet the statutory requirement. *Stephanie F.*, 270 P.3d at 753.

We further observe the court's emphasis on Adam's continued coercive and controlling behavior and how this posed a risk of substantial harm to the child. The risk identified by the court may be nuanced and difficult to detect as compared to injuries due to physical abuse, clear disparaging remarks, or conduct by a parent in front of a child.[58] But the nuanced nature of the risk does not render it less serious.[59] The court here explained its concern that until Adam meaningfully engaged in behavior change, there continued to be a great risk that the parties' child would internalize her father's behavior and attitude toward others such as Mackenzie. And contrary to Adam's argument, removal of Mackenzie from the supervised visitations, consistent with the court's initial order, would not remove the risk associated with Adam's own behavior. In other words, although removal of Mackenzie from the supervised visitations would decrease the likelihood of the child directly observing Adam's violence against Mackenzie, it would not mitigate other ways in which Adam's coercive and controlling behavior could influence and impact the child.

We also note that the court's findings regarding Adam's behavior, and the risks associated with that behavior, were informed by multiple opportunities to observe and interact with the parties over an extended period of time. Over time, the court observed that Adam's coercive and controlling behavior had continued with a different partner and that Adam had not meaningfully engaged in a DVIP program. Given this history of continued perpetration of significant acts of domestic violence, the court's

---

[58]     *See, e.g.*, *Borchgrevink v. Borchgrevink*, 941 P.2d 132, 140 (Alaska 1997) (physical abuse of other parent); *J.D. v. C.S.*, No. S-9552, 2001 WL 34818209, at *2 (Alaska Feb. 28, 2001) (parental misconduct); *Taylor v. Taylor*, 970 N.W.2d 209, 212 (N.D. 2022) (conduct in children's presence).

[59]     *See Borchgrevink*, 941 P.2d at 140 ("[T]he deleterious impact on children of witnessing domestic violence is widely recognized. . . . [E]ven if the physical violence between the parties has ceased, the abusive ex-spouse may continue to engage in controlling behaviors that adversely affect the children.").

findings regarding the risk of substantial harm to the child associated with even supervised visitation, its findings regarding Adam's failure to meaningfully engage in treatment, even after having been previously ordered to do so, and its identification of clear steps Adam could take in order to resume visitation, we conclude the court did not abuse its discretion in temporarily suspending Adam's visitation.

## V.    CONCLUSION

We AFFIRM the superior court's order in all respects.